## TEXAS PACIFIC COAL & OIL CO. v. COMANCHE DUKE OIL CO. (No. 7373.)

(Court of Civil Appeals of Texas. San Antonio. June 3, 1925. Rehearing Denied June 17, 1925.)

1. **Mines and minerals** ⊂∞121—**Owner of producing well cannot complain if neighbor sinks well in adjoining tract, destroying value of his well.**

Owner of a producing well cannot complain if his neighbor sinks a well on an adjoining tract, even though latter operation drains all oil from both tracts and destroys value of first well.

2. **Mines and minerals** ⊂∞47—**Owner of surface obtains no title to oil beneath surface until he reduces it to possession.**

Owner of surface obtains no title to oil thereunder unless he first reduces it to possession, for as long as oil is in fugitive state it is subject to capture by any person seeking it in good faith from own premises as base, and in a manner not intended to willfully injure another.

3. **Mines and minerals** ⊂∞92—**If offset well does not efficiently tap source of pioneer well, artificial means may be resorted to to force production.**

If a well, sunk to offset a well sunk on adjacent land, does not efficiently tap source of pioneer well, operator of former may resort to artificial means, such as pumps and explosives, to force production, even though by so doing he destroy pioneer well by absorbing source.

4. **Mines and minerals** ⊂∞125—**Evidence insufficient to show that 600 quarts of nitroglycerin was excessive charge in shooting well.**

In an action for negligence in causing flow of oil in plaintiff's well to cease, evidence *held* insufficient to show that 600 quarts of nitroglycerin was an excessive charge to shatter a formation of hard lime 212 feet thick.

5. **Mines and minerals** ⊂∞125—**Negligence of defendant in shooting well cannot be inferred from difficulties in plaintiff's well thereafter.**

Negligence of defendant in shooting its own well cannot be inferred from mere occurrence of difficulties in plaintiff's well on adjacent property following shooting, doctrine of res ipsa loquitur not applying in such cases.

6. **Mines and minerals** ⊂∞125—**Evidence held not sufficient to show that defendant's shooting caused oil to stop flowing in plaintiff's well.**

In an action for negligence in causing flow of oil to cease, evidence *held* not sufficient to show that defendant's shooting of adjacent well caused oil in plaintiff's well to stop flowing.

7. **Evidence** ⊂∞7—**Matter of general information that oil and salt water at great depths are more elusive and capricious in percolations than subsurface waters.**

It is perhaps a matter of general information that both oil and salt water at great depths are more elusive and capricious in their percolations than natural subsurface waters.

8. **Mines and minerals** ⊂∞125—**Fact that shooting caused oil in plaintiff's well to cease flowing held insufficient to show actionable negligence, where shot applied in usual manner.**

Assuming that defendant's shooting of well caused plaintiff's adjoining well to stop flowing oil, that fact alone is insufficient to establish fact of actionable negligence on part of defendant, where evidence showed defendant measured, gauged, adjusted, and set off charge in manner universally employed in oil fields.

9. **Mines and minerals** ⊂∞121—**Operator liable when act of shooting well done negligently or with intent to injure neighbor's well.**

An operator of an offset well is liable for injuries caused to neighbor's well in shooting well, where he was negligent in shooting well or willfully intended to injure neighbor thereby.

Appeal from District Court, Tarrant County; R. E. L. Roy, Judge.

Action by the Comanche Duke Oil Company against the Texas Pacific Coal & Oil Company. From a judgment for plaintiff, defendant appeals. Reversed, and judgment rendered for defendant.

John Hancock and Clarence Wightman, both of Fort Worth, for appellant.

McLean, Scott & Sayers, Theodore Mack, and Henry Mack, all of Fort Worth, for appellee.

SMITH, J. Appellant, Texas Pacific Coal & Oil Company, and appellee, Comanche Duke Oil Company, owned oil leases on adjoining

---

⊂∞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

tracts of land near the south line of Stephens county, in what is known as the "Ranger" oil field. Appellee drilled a well on its lease near appellant's line, which became a producer of oil in paying quantities. Shortly afterwards appellant also drilled a well on its lease, 300 feet from and in offset of appellee's well.

It appears that wells in that vicinity did not usually produce oil naturally, as a result of drilling into or through the oil structure, and operators were therefore forced to resort to the use of explosives with which to shatter the formation and induce production. For this purpose they used nitroglycerin, which was lowered into the well and exploded against the so-called oil-bearing structures. This process is known as "shooting" wells. Appellee itself resorted to this process on two occasions in bringing in its well, which was 3,696 feet deep; it used something over 200 quarts of nitroglycerin with each shot, made at different depths. And when appellant completed its well, at a depth of 3,680 feet, it shot the well, first with 200 quarts of nitroglycerin, and this shot failing in result, the second shot was resorted to, this time with 600 quarts of nitroglycerin.

It is contended by appellee that the second shot in appellant's well resulted in stopping the flow of oil from appellee's well, and produced a flow of salt water which destroyed its value as a producer. It is conceded by appellee that appellant had the right to shoot its well, and to shoot it with nitroglycerin, at the very time and place of the occurrence. The effect of this concession is to reduce or restrict appellee's complaint to the single contention that in shooting its well appellant used an unnecessarily and unreasonably heavy charge of explosive, knowing that the resulting explosion would stop the flow of oil from appellee's well and let in the flow of salt water, thus destroying the value of the well. Thus arises the controlling question in the appeal.

The doctrine is now well established that petroleum oil in its normal state is of a fugitive nature, restlessly and ceaselessly moving about in the bowels of the earth in response to natural forces and influences which have never been fathomed or mastered by human science. Because of this peculiar characteristic, oil may never become the subject of definite barter and sale, or of absolute ownership, unless and until it is brought to the surface of the earth and reduced to physical possession.

[1, 2] The owner of the surface of one tract of land, and of a producing well thereon, cannot complain if his neighbor sinks a well on the adjoining tract, even though the latter operation drains all the oil from beneath both tracts, and thereby completely destroys the purpose and value of the first well. This rule rests upon the doctrine stated, that the owner of the surface obtains no title to the oil beneath that surface until and unless he first reduces it to his possession; for, so long as it is in the fugitive state, it is subject to capture by any person seeking it in good faith from his own premises as a base, and when once captured the title becomes vested in the captor. Offset wells are thus authorized by the rule stated, which is universal.

[3, 4] The doctrine goes further. If the offset well does not efficiently tap the source from which the pioneer well gets its flow, then the operator of the former may resort to artificial means in order to force production, and by this means he may destroy the value of the initial well by absorbing the entire source. This may be done by the use of pumps sunk into the offset well, to operate which the owner may use all the force necessary to accomplish the purpose, even though it may divert the whole supply of the first well and thus completely destroy its value. Or, it may be done by means of explosives, as in this case, whereby the formations in the ascertained oil-bearing structure are broken up so as to divert the product from the first well and draw or force it into the offset well and thence to the surface and into the possession of the operator of the latter. These rules are now thoroughly and universally established, and are freely conceded by appellee in this case. So, we return to the concrete question presented by the case made, and that is: Was appellant guilty of negligence merely because it used as much as 600 quarts of nitroglycerin in shooting its well? We have concluded that there is no evidence in the record to support the jury's affirmative answer to this question, and that therefore, that being the controlling question, appellee was not entitled to recover in the case.

[5] The negligence of appellant cannot be inferred from the mere occurrence of the difficulties in appellee's well following the shooting of appellant's well. The doctrine of res ipsa loquitur does not apply in cases of this nature. This is conceded by appellee, and is the established rule. Accordingly, we are relegated to an analysis of the evidence to determine if it is sufficient to support an inference of negligence.

[6] In the first place, the finding of the jury that the explosion proximately caused the flow of oil to cease, and the flow of salt water to begin, in appellee's well, must have had its basis in pure conjecture and irresponsible speculation. For, as a matter of fact, established by appellee's own testimony, the shot was promptly followed by an unusually heavy flow of oil from appellee's well, the heaviest flow it had ever before produced; and there is evidence, embraced in an agreed statement of the pipe line runs from the well, that the average daily production for the month next following the shot was greater than that of the month next

preceding the shot, and that of the second month was heavier than that of the first, after which it decreased irregularly until the well was abandoned two years later. There was no effort to explain this queer and inconsistent conduct of the well, unless the explanation is supplied by the mere happening of the events following the explosion, and that explanation does not suffice. We suppose there could be no satisfactory explanation of it based upon either experience or science, which does not seem to have ever comprehended, controlled, or subdued the mysterious forces or elements which inhabit the far interior of the earth, at least in so far as they affect liquid or gaseous substances. The operation here complained of occurred more than three-fifths of a mile beneath the surface of the earth, and it is not contended that any one knows, or could possibly determine, whether the source of the oil tapped by appellee's well was reduced or its volume materially affected by the explosion in question. So far as known, or shown by the evidence, the supply may have been enlarged by the shot; certainly it appears to have been at least temporarily accelerated by it. But, even if it was in fact materially diminished, it was after all no more the property of appellee than of appellant so long as it was a fugitive; and the latter had the right to use whatever means and force necessary to effect its capture, so long as it operated from its own premises and in a manner not willfully intended to unnecessarily injure appellee.

[7] The same rule would apply to appellee's charge that the shot induced the flow of salt water into its well. It was shown that all oil wells in that field sooner or later yielded to salt water, which operated without apparent consistency, appearing in the wells at varying depths and in varying volume; it was as capricious, as uncertain, as inconsistent, as elusive as oil. No one testified, no one knew or could possibly ascertain so far as the record shows, when in any event salt water would have appeared. If salt water percolating at that depth beneath the earth's surface has any settled habit of course, distance, volume, or of conduct other than that of sooner or later appearing in and flooding oil wells, the peculiarity was not disclosed by the evidence in this case. It is perhaps a matter of general information, based upon experience and observation, that both oil and salt water at great depths are more elusive and capricious in their percolations than natural subsurface waters, as to which the Supreme Court of Texas lays down this rule, expressed by the Supreme Court of Ohio in Frazier v. Brown, 12 Ohio St. 294:

"In the absence of express contract and of positive authorized legislation, as between proprietors of adjoining land, the law recognizes no correlative rights in respect to underground waters percolating, oozing, or filtrating through the earth; and this mainly from considerations of public policy: (1) Because the existence, origin, movement and course of such waters, and the causes which govern and direct their movements, are so secret, occult and concealed that an attempt to administer any set of legal rules in respect to them would be involved in hopeless uncertainty, and would therefore be practically impossible. (2) Because any such recognition of correlative rights would interfere, to the material detriment of the commonwealth, with drainage of agriculture, mining, the construction of highways and railroads, with sanitary regulations, building, and the general progress of improvement in works of embellishment and utility." Houston & T. C. R. Co. v. East, 98 Tex. 146, 81 S. W. 279, 66 L. R. A. 738, 107 Am. St. Rep. 620, 4 Ann. Cas. 827.

[8] But let us assume, for the purpose of disposing of the ultimate issue of negligence, that the evidence was sufficient to support the inference that the shooting of appellant's well did in fact stop the flow of oil and induce the flow of salt water in appellee's well. That assumption cannot by its own force establish the fact of actionable negligence on the part of appellant; for there is no contention that the shot was applied in any other than the usual manner employed in that or other fields, or that the explosive was improperly adjusted or ignited. The sole complaint is that an excessive charge was exploded in the well. But this complaint is not supported by any affirmative evidence. The amount of explosive used was the usual and customary amount employed in that field to shatter structures of the nature and thickness of that in appellant's well. The size of the charge actually used was determined by the vertical thickness of the definitely ascertained structure, as was the custom. The formation in this well was of hard lime, 212 feet thick. It was customary, and deemed necessary by operators, to shatter the structure laterally throughout its thickness in order to exploit the formation, and that was done in this case. Thousands of wells in that field had been shot, many of them with heavier charges than that exploded by appellant. It was not shown, it is not contended here, that the vertical thickness of a given shot controlled the effect thereof upon offset wells, or that in any other case the shooting of one well operated to produce salt water, or impair or destroy the flow of oil, in other wells, except to drain the oil from adjoining lands and thereby take it away from nearby wells, which is the sole and concededly legitimate object of all offset wells and the shooting thereof. Under this state of facts, there is deemed to be no evidence of negligence upon the part of appellant in shooting its well. It measured, gauged, adjusted the charge, and set it off, in the manner universally employed in that field, and the fact, if true, that the shot produced the results complained of, and which it is not

contended appellant could or should have foreseen, cannot support an inference of actionable negligence. We think under the facts we have fully and perhaps tediously stated appellee was not entitled to recover, and that the court should have directed a verdict for appellant, as it requested.

[9] We do not wish to be understood as holding that the operator of an offset well would not become liable for acts of negligence in shooting its well when those acts are clearly shown to have been negligent, or to have been done with the intent to unnecessarily injure his neighbor; for in such cases undoubtedly he would be liable in damages for such injuries. We mean merely to hold that no such case as that is presented in the record here; that, having an unquestioned right to shoot its well with the means used, and having exercised that right in the usual and customary way, without proof of its negligence or intent to unnecessarily injure, appellant was not liable in damages for the injuries complained of, even though it be shown that those injuries were in fact proximately caused by the operation. We think, under the facts presented, this holding is supported by the authorities. Morrison De Soto Oil & Gas, 182 et seq.; 1 Thornton Oil & Gas (4th Ed.) 372; Archer Oil & Gas, 778; 18 R. C. L. 1208; Houston & T. C. R. Co. v. East, 98 Tex. 146, 81 S. W. 279, 66 L. R. A. 738, 107 Am. St. Rep. 620, 4 Ann. Cas. 827; Prairie, etc., Co. v. State (Tex. Com. App.) 231 S. W. 1088; People's Gas Co. v. Tyner, 131 Ind. 277, 31 N. E. 59, 16 L. R. A. 443, 31 Am. St. Rep. 433; Booth v. Rome & W. & O. T. R. Co., 140 N. Y. 267, 35 N. E. 592, 24 L. R. A. 105, 37 Am. St. Rep. 552; Fitzsimons v Braun, 199 Ill. 390, 65 N. E. 249, 59 L. R. A. 421.

The judgment of the trial court will be reversed, and as the case appears to have been fully developed, judgment is here rendered that appellee take nothing.

Reversed and rendered.