**COMANCHE DUKE OIL CO. v. TEXAS PAC. COAL & OIL CO.** (No. 805—4466.)*

Commission of Appeals of Texas. Section A. Oct. 12, 1927.

**1. Negligence ⬤⟿2—Negligence being violation or disregard of duty, conditions affecting actor's right and scienter must be considered.**

Negligence being violation or disregard of some duty, conditions on which actor's right depends and scienter which should induce recognition and observance of right's correlative are elements for primary consideration in action for damages.

**2. Adjoining landowners ⬤⟿8—Surface boundary and plane through it to earth's center marks boundary between right and trespass.**

Boundary of tract, as delineated on surface and by plane struck through surface line to earth's center, marks boundary between right and trespass in respect to locus of user of claimed right.

**3. Adjoining landowners ⬤⟿3—Physical invasion of "lateral support" area, entails absolute or contingent liability, according to whether injury is to adjoining tract in natural state or to improvements.**

Near boundary of tract and from surface to earth's center is area of sort of common ownership, known as right to "lateral support," physical invasion of which, with resultant damage directly attributable to injury to property in or on adjoining tract, entails liability absolute, or contingent on lack of due prudence, according to whether injury is to adjoining tract in its natural state or to improvements.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Lateral Support.]

**4. Adjoining landowners ⬤⟿8—Ownership of land includes constituents of earth and air whereby force set in motion in one tract is carried into nearby tracts.**

Ownership of land includes tangible and intangible constituents of earth and air, by which force set in motion on or in one tract may be carried into nearby tracts, whether viewed separately or as combination of related units.

**5. Adjoining landowners ⬤⟿8—One may properly use land though force thereon may reach other tracts, but cannot use tract to infringe neighbor's legal rights.**

Constituents of earth and air, whereby force set in motion on or in one tract may be carried into other tracts, do not prevent one from properly using his land, though such user may damage his neighbor's land, but one tract cannot be used as medium of infringing a neighbor's legal rights.

**6. Adjoining landowners ⬤⟿8—Injuries from consequential user of land are damnum absque or damnum injuria, either absolutely or contingent on exercise of due prudence.**

Injurious results of consequential user of land to other tracts are damnum absque or damnum injuria, either absolutely or contingent on exercise of due prudence as circumstances may require.

**7. Adjoining landowners ⬤⟿8—Consequences of reasonable, duly careful primary use of land for lawful purpose, without physical trespass, are damnum absque injuria.**

If purpose of use of land be lawful, physical trespass absent, primary use reasonable, and manner of use duly careful, consequences of transmission of force, set in motion in one tract to nearby tracts are damnum absque injuria.

**8. Mines and minerals ⬤⟿121—Company shooting oil well owed duty to avoid physical invasion of adjoining tract or area of lateral support and disturbance of possession and enjoyment thereof by prudent choice of implements.**

Company drilling oil well near well on adjoining tract had right to make further exploitation of supposedly oil-bearing strata, when satisfactory results were not obtained by drilling, but owed duty to avoid altogether physical invasion of adjoining tract or area of lateral support and otherwise to avoid disturbance of

---

⬤⟿For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Rehearing denied December 7, 1927.

possession and enjoyment of such tract, except so far as reasonably essential to its proprietorship, by prudent choice of implements.

**9. Negligence ⬥⟹4—Measure of caution appropriate to danger is required.**

While standard of conduct which law prescribes, such as "ordinary care," does not change, it exacts measure of caution appropriate to danger involved.

**10. Evidence ⬥⟹66—Nitroglycerin was chosen to shoot oil well with presumed scienter that it is most dangerous tool, as commonly known.**

In making further exploitation of supposedly oil-bearing strata, when satisfactory results were not obtained by drilling, nitroglycerin was chosen as implement with presumed scienter that a most dangerous tool was being selected; such quality resting in common knowledge.

**11. Mines and minerals ⬥⟹121—Driller was bound to use ordinary care in selecting amount of nitroglycerin to be used in shooting oil well.**

In using nitroglycerin as implement for further exploitation of oil-bearing strata, when satisfactory results were not obtained by drilling, driller was put to choice of amount to be used, and assumed obligation to use at least ordinary care in making selection.

**12. Negligence ⬥⟹1—Negligence may consist in doing something which should be done differently or not at all.**

Negligence may consist in doing something which ought to be done in a different manner or not at all.

**13. Mines and minerals ⬥⟹125—Driller held not to have exercised due care, as matter of law, in using one large shot, instead of successive smaller shots, of nitroglycerin for shooting oil well.**

Company drilling oil well *held* not to have exercised due care, as matter of law, to avoid damaging well on adjoining tract, in using single 600-quart shot of nitroglycerin, instead of successive smaller shots as means of further exploiting supposedly oil-bearing strata when satisfactory results were not obtained by drilling.

**14. Mines and minerals ⬥⟹121—Due care in choosing quantity of nitroglycerin to explode in oil well involved good faith observance of all relevant data, including things known and consciously unknown about qualities of explosive and area affected.**

Due care in choice of quantity of nitroglycerin to be used for further exploitation of oil-bearing strata, when satisfactory results were not obtained by drilling, involved good-faith observance of all relevant data and its lessons, including what was known and consciously unknown about qualities of explosive and area in which its force was to be exerted.

**15. Negligence ⬥⟹1—Men must employ senses in humanitarian direction.**

There is a general obligation on men to employ their senses in a humanitarian direction.

**16. Explosives ⬥⟹7—Intelligence to be applied in nitroglycerin increases with warning that another or his property may be endangered.**

Quantum of intelligence, to be applied in setting dangerous forces, such as nitroglycerin, in motion, must increase with warning that actor may be putting another man or his property in danger.

**17. Mines and minerals ⬥⟹105(2)—Oil company, whose superintendent protested use of quantity of nitroglycerin shot in well, had scienter of possible disaster, requiring closest scrutiny of data to avoid damaging well on adjoining tract.**

Oil company, whose district superintendent of operations, who had shot and superintended shooting of many wells, protested use of 600-quart shot of nitroglycerin, when satisfactory results were not obtained by drilling, had consciously active scienter of possible disaster, requiring closest scrutiny and weighing of relevant data in exercise of ordinary care to avoid damaging well on adjoining tract.

**18. Mines and minerals ⬥⟹121—That single large shot of nitroglycerin in oil well was required to shatter formation desired would not authorize such shot, instead of successive smaller shots.**

That 600-quart shot of nitroglycerin was required to shatter formation, which owner of oil well desired to exploit, would not authorize use of such quantity in single shot, instead of successive smaller shots less likely to damage well on adjoining tract; owner having no absolute right to decide on amount of formation to be shattered at one charge.

**19. Mines and minerals ⬥⟹125—Evidence in action for damage to oil well by excessive shot of nitroglycerin in well on adjoining tract held to warrant finding of negligence in misreading log of latter well or ignoring data.**

In action for damages by flooding of oil well with salt water because of excessive shot of nitroglycerin in well on adjoining tract, evidence *held* to warrant finding of negligence, either in mistaken reading of log to ascertain nature of formation to be exploited or in ignoring warnings of its data.

**20. Negligence ⬥⟹1—Action disapproved by one or approved because of unjustified ignorance is evidence of negligence, especially where he is expert.**

If "the man on the spot," charged with using his senses and duty to discover perils reasonably ascertainable, does something which his judgment disapproves, or approves something because of unexplained, or otherwise unjustified, ignorance of important fact, there is evidence of negligence, especially where he is an expert.

**21. Negligence ⬥⟹5—Customary practices may be unlawful or unreasonable or include negligence.**

Customary practices, conformity to which is relied on as negativing negligence, may be unlawful or unreasonable of themselves or include negligence, either as including too much or too little as in failing to observe new things, which

ordinarily prudent man would, in response to advanced learning and skill.

**22. Negligence ⬤⟹124(3)—Purpose of usage testimony is to aid fact trier in applying standard of conduct prescribed by law.**

Purpose of usage testimony, when admissible in dispute beyond contract field, is not to fix standard of conduct, but to give evidence aiding trier of facts in applying standard of conduct prescribed by law.

**23. Mines and minerals ⬤⟹125—Supposed custom making size of nitroglycerin shots in oil wells dependent on thickness of formation owner desires to exploit held no defense to action for damages to well on adjoining tract.**

Supposed custom that usual shot of nitroglycerin for further exploitation of oil-bearing strata, when satisfactory results are not obtained by drilling, depends on thickness of formation which owner desires to exploit, *held* no defense to action for damages to well on adjoining tract.

**24. Mines and minerals ⬤⟹125—Evidence in action for damage to oil well held to warrant finding that 600-quart shot of nitroglycerin in well on adjoining tract was not ordinary and customary.**

In action for damage to oil well by explosion of excessive shot of nitroglycerin in well on adjoining tract, evidence *held* to warrant finding that 600-quart shot used by defendant was not ordinary and customary.

**25. Negligence ⬤⟹56(I)—Proof of proximate cause is essential.**

Proof tending to show proximate cause is as essential to recovery of damages as proof of negligence.

**26. Mines and minerals ⬤⟹125—Evidence held to establish naturalness, probability, and anticipation, necessary to show that nitroglycerin shot in oil well proximately caused damage to well on adjoining tract.**

Evidence of use of 600-quart shot of nitroglycerin in oil well with scienter that part of it would cross boundary of adjoining tract, in obedience to natural laws, with such force as to produce some such injury as flooding of well on adjoining tract with salt water by destruction of protective structure, either alone or in concurrence with other contributing forces, other than injured person's wrong, sufficiently established naturalness, probability, and anticipation required in proximate causation.

**27. Mines and minerals ⬤⟹125—Whether salt water appeared in plaintiff's oil well as result of explosion of nitroglycerin in another well than defendant's held for jury.**

Whether salt water appeared in plaintiff's oil well as result of explosion of shot of nitroglycerin in another well than defendant's before shot in defendant's well *held* for jury on conflicting evidence of identity of shot causing big flow preceding such appearance and duration of such flow.

**28. Mines and minerals ⬤⟹125—Evidence held to warrant finding that nitroglycerin explosion in defendant's oil well opened passageway for salt water toward plaintiff's well and beyond boundary of parties' adjoining tracts.**

In action for damages by flooding of oil well with salt water because of nitroglycerin shot in defendant's well on adjoining tract, evidence *held* to warrant finding that such explosion opened passageway in direction of plaintiff's well and beyond boundary between tracts.

**29. Evidence ⬤⟹588—Juror should not disregard ordinary workings of natural laws, nor basic truths of science.**

Juror should not disregard ordinary workings of most commonly accepted natural laws, nor basic truths of science, with which all men are presumed to be familiar.

**30. Mines and minerals ⬤⟹125—Evidence of greater run of oil from plaintiff's well after alleged damage by explosion in defendant's well held not conclusive, in view of evidence that substantial part thereof was produced and stored before explosion.**

In action for damages by flooding of oil well with salt water because of excessive shot of nitroglycerin in defendant's well on adjoining tract, evidence that average daily run of oil in pipe lines from plaintiff's well for two months following shot was greater than for month preceding it *held* not conclusive against plaintiff, in view of testimony that such oil was in substantial part produced and put in storage before explosion.

**31. Trial ⬤⟹139(I)—Litigant need not prove cause or defense to certainty, but such proof dispenses with ordinary jury use.**

A litigant is not required to prove his cause or defense to extent of certainty, but such certainty, if reached, dispenses with ordinary jury use.

**32. Appeal and error ⬤⟹929—Juror is presumed ordinarily intelligent man, to whom considerable deduction may be left.**

Juror is presumed to be ordinarily intelligent man, to whom considerable field of deduction may be left.

**33. Trial ⬤⟹139(I)—Proof permitted by nature of case makes fact issue at least if reasonably probable.**

Litigant making proof of kind permitted by nature of case makes fact issue at least when he advances to reasonable probability.

Error to Court of Civil Appeals of Fourth Supreme Judicial District.

Action by the Comanche Duke Oil Company against the Texas Pacific Coal & Oil Company. A judgment for plaintiff was reversed, and judgment rendered for defendant, by the Court of Civil Appeals (274 S. W. 193), and plaintiff brings error. Reversed, and judgment of the district court affirmed.

McLean, Scott & Sayres, Theodore Mack, and Henry Mack, all of Fort Worth (H. K. Welch, of Ft. Worth, of counsel), for plaintiff in error.

---

John Hancock and Clarence Wightman, both of Fort Worth, for defendant in error.

### Statement of the Case.

NICKELS, J. Comanche Duke Oil Company sued Texas Pacific Coal & Oil Company and made the following substantial averments:

(a) It owned the mineral estate in a certain 10-acre tract of land in Stephens county upon which, prior to December 23, 1919, it had developed a well in which "oil was found in large and paying quantities," and from which oil continued to flow at the rate of about 500 barrels per day until about the 23d day of December, 1919, "when the said well was completely destroyed, demolished and rendered worthless by reason of the negligence, carelessness, and unlawful acts and conduct of the defendant, its agents, and employees, as is more particularly described hereinafter."

(b) Defendant owned or controlled the mineral estate in an adjoining tract of land upon which, and within 300 feet of plaintiff's well, it drilled a well to about 3,700 feet in depth. "Upon reaching said depth, the defendant, not being satisfied with the quantity of oil there found, negligently and carelessly and with full knowledge of the consequences that would follow, placed and caused to be placed and discharged" in its well "large and dangerous quantities of nitroglycerin consisting of about 600 quarts of said glycerine, and when the same was exploded by the defendant * * * the same disturbed and tore asunder the earthen structure for many hundreds of feet adjacent to the same, and particularly did break a certain structure which was keeping water from out the well of plaintiff, thereby causing the water to rush continually into said well and entirely destroying plaintiff's source of oil supply."

Recovery of damages in the sum of $300,000 was prayed. With a general demurrer and special exceptions (not material here) defendant answered with a general denial and, specially, that what was done by it "was a reasonable and customary use" of its property, which was "a reasonable, customary, and necessary use of said premises in a development of same for oil and gas purposes," and that what was done by it was done "in accordance with the custom of said business known to and practiced by all operators in said field, including the plaintiff," and "in the usual and customary manner followed by all operators in said territory."

The following diagram will illustrate the relative locations, etc., of the parties and of others in the immediate neighborhood:

O.....300 feet.....O.....300 feet....O

East-West Common Boundary.

O.....300 feet.....O.....300 feet.....O.....300 feet....O

Locations of wells are indicated by "O"; these north of the "common boundary" are "Harrison Nos. 2, 3, and 4" of Texas Pacific Coal & Oil Company, No. 3 being farthest west and No. 4 being farthest east; No. 2 is 300 feet directly north of Comanche Duke Oil Company's well, which is the second from the east below the "common boundary." The first well to the east, below the boundary, is owned by the "Big Seven" group, and those to the west of Comanche Duke Oil Company's well are owned, respectively, by the "Bowhead" Company and the Prairie Oil & Gas Company. "Harrison No. 2" is the well in which the explosion occurred. All these wells were drilled by Hivick & Mohler, contractors, and logs of them were prepared and (except for that of the "Big Seven") became a part of the record.

For depths below 3,200 feet the logs, respectively, show strata as follows:

Plaintiff's well: 3200–330, black slate; 3330–60, sandy shale; 3360–85, brown shale; 3385–3409, slate; 3409–46, limestone; 3446–74, black slate; 3474–3563, "black lime;" 3563–66, "showing of oil;" 3566–3620, black slate; 3620–40, gray limestone; 3640–52, "black lime;" 3652–54, shale; 3654–77, sandstone; 3677–96 (bottom), "black lime."

Defendant's "Harrison No. 2": 3200–25, "black lime;" 3225–80, black shale; 3280–85, "black lime;" 3285–3340, black shale; 3340–95, shale; 3395–3415, black shale; 3415–50, "black lime;" 3450–89, black shale; 3489–3570, "black lime;" 3570–3620, black shale; 3620–41, limestone; 3641–55, "black lime;" 3655–95 (bottom), "showing of oil."

"Bowhead" well: 3200–3421, black shale; 3421–56, "black lime;" 3456–3504, black shale; 3504–64, "black lime;" 3564–3538, gray limestone; 3638–43, slate; 3643–50, "black lime;" 3650–70, gray limestone; 3670–80, "black lime;" 3680–85, gray limestone; 3685–3710, "black sandy limestone;" 3710–18 (bottom), slate.

Prairie Oil & Gas well: 3200–3400, shale; 3400–10, "black lime;" 3410–55, limestone; 3455–65, black shale; 3465–75, "black lime;" 3475–3585, limestone; 3585–3650 (bottom), nature of strata not shown.

Defendant's "Harrison No. 4": 3200–3320, black shale; 3320–40, "black lime;" 3340–70, black shale; 3370–75, sandstone; 3375–3435, "black lime;" 3435–75, black shale; 3475–3500, "black lime;" 3500–25, black shale; 3525–3620, "black lime;" 3620–3700, black shale; 3700–80 (bottom), "black lime and shale."

Defendant's "Harrison No. 3": 3200–3415, black shale; 3415–35, "black lime;" 3435–75, black shale; 3475–3500, "black lime;" 3500–5, "showing of oil;" 3505–3600, "black lime;" 3600–15, black shale; 3615–50, bottom, sandstone.

From surface downward to about the 600-foot level the logs show a comparative uniformity of strata; and between the 600-foot and 3200-foot levels substantial disparities

in numbers and compositions of strata are shown.

The "usage" proof, introduced by defendant, consisted of the testimony of its witnesses Gordon (who at the time of the explosion was its officer and agent), that of Rapp, Nentwig, and Crow, "oil well shooters" employed by various torpedo companies, that of Mohler and Stone (members of the firm of Hivick & Mohler), and some testimony given by Calvert upon cross-examination, Calvert, at the time of the explosion and before and after that, was defendant's district superintendent in charge of operations in Stephens county; he appeared as a witness for plaintiff. The substance of that testimony is next shown:

Rapp:

"The amount of the lime that you have got with a showing of oil is what governs the size of a shot in a well; that is, from where you strike the lime to where you go through it. At that time nearly everybody was using 5-inch shells. Most of the wells were 6¼ and 6⅝ inch holes. * * * They would put in enough of these 5-inch shells to cover the entire strata of the formation which they desired to shoot; that is known as shooting the formation. From my experience as a shooter in those fields, * * * a shot of 600 quarts was the usual and customary size of a shot to be made in an oil well; they even shot heavier than that. The heaviest shot that I know of as having been made in that district was 980 quarts. The company that I worked for shot one out of Cisco with 980 quarts. I shot a well for the Texas Company north about 5 or 6 miles with 690 quarts, and I shot one right next to it with 500 quarts. The Sullivan lease belonging to the Texas Company was shot with 690 quarts. The R. G. Lee was next to it, and it was shot with 500 quarts."

On cross-examination he said that the well in which 980 quarts were used "was a wild cat," with no well that he knew of "in 5 miles of it."

Nentwig:

"I * * * am familiar with the size of shots that my company used in shooting oil wells in those fields. A shot of 600 quarts of nitroglycerin in an oil well in that territory was an ordinary and customary shot to be made at that time."

Cross-examination: "I do not think that it is a fact 'that 900 out of 1,000 wells shot in Stephens county were shot with less than 100 quarts of nitroglycerin.' Our usual shot was not about 80 quarts at that time. We were shooting 40 quarts in some of them, and 60 quarts in some of them, and 80 quarts in some of them, and in some 120. * * * A shot of 600 quarts * * * was not an exceptionally big lead, because they were all hard shots at that time, hard lime shots. I don't remember how many wells that I shot with 80 quarts, * * * but quite a few. I shot several with 100 quarts. I shot a well on the Hamil lease * * * using 660 quarts; that was not a wild cat well, there was a well in 600 feet of it" and it "was not affected by the shot." "An-

other well * * * was shot with 500 quarts. I helped shoot a well on the Jennings lease with 570 quarts. I also shot the well * * * on the Lee farm using 570 quai , * * * also a well on the Rosenquest farm—I used 480 quarts on that well." "It is a fact that 90 out of every 100 wells that I shot in the same formation in Stephens and Eastland counties were shot with less than 100 quarts of nitroglycerin."

Redirect examination: "The first shot in the Britten well was 450 quarts, and the second shot was 500 quarts, and the third shot was 960 quarts. The Donnell well was shot with between 500 and 600 quarts. The oil operator is the one who directs us to shoot the well and the amount of shot to place in the well."

Crow:

"During the year of 1920, there were a good many wells in that territory being shot with 600 quarts of nitroglycerin. The amount of formation controlled the size of the shot used; that is, the amount of formation that you wanted to shoot. In other words, if you only had 50 feet of formation, then you would put in a shot large enough to cover that formation, * * * you would put in enough to cover the formation that was ordered shot. * * * I shot a well on the Dabbs farm with 500 quarts, and I shot the same well on January 31, 1921, with 870 quarts. I also shot one on the Langford farm * * * with 440 quarts *. * * one on the Dooley farm was shot with 510 quarts. We have any number of them that runs from 300 to 600 quarts, which I did not personally do myself, but which, in looking over the report I have here, I notice. * * * I shot one on the Baker farm, * * * and I shot one on the Le Ray farm with 540 quarts. We shot one * * * for Prairie Oil & Gas Company at Gunsight with 580 quarts."

Cross-examination: "I would not say that I shot 500 or 600 wells with less than 100 quarts. * * * I didn't shoot that many wells at that time. I think in 1920 that the average of the shots in that territory * * * would be around 300 quarts. It was nothing uncommon for 300 or over."

Gordon:

"During that period it was customary to shoot all wells which did not come in in paying quantities. I think all of the companies did; it certainly was customary with us. The formation itself; that is, the thickness of the formation, controlled the size of the shot with which the well was shot. If you are shooting a well in this sand (that is, sand described as being rock, etc., much softer than black lime) a little shot is usually adapted, because you would get the cracking effect with a small shot. It would require a much heavier shot in the black lime, one being very much harder than the other. If your sand was 20 feet thick, you would want to use a 20-foot cartridge; you would put in as many quarts to a running foot as you would in the lime. The thickness of the formation governs the length of your shell, and the hardness governs the diameter of the shell. In other words, if you wished to shoot a formation that was 200 feet thick, you would put in enough cartridges to make a 200-foot shell. You would have to have a shell 200 feet

long to shatter that from top to bottom. * * * Back in 1919 and 1920, in that black lime formation, I think the usual shots were anywhere from four to six to seven and eight hundred quarts in shooting a well. Of course, that depended on the thickness of the formation you wanted to shoot."

Mohler said that the "largest shot that he knew of in Stephens county was 700 quarts" which was used in a Mid-Kansas Oil Company's well, and that other "large shots were placed" as follows: 700 quarts in another Mid-Kansas well, 500 quarts in the Jennings well, 540 quarts, each, in a Sun Company and in a Prairie Oil & Gas Company well, Stone said:

"The largest shot that was ever used in Stephens county so far as I know was in the Texas Pacific Coal & Oil Company's Harrison No. 2; I do not recall of any wells at this time that were shot in that county during the years of 1919, 1920, and 1921 with any shot larger than 400 quarts other than Harrison No. 2."

Calvert, prior to this "shot," had "shot, seen shot, and superintended the shooting of approximately 45 wells" for defendant, and he said he had not used as much as 600 quarts at any one time or place, and "protested" the use of that much at the time; he remained district superintendent (in charge of operations in Stephens county) for defendant until early in 1921 and, he said, "That is the only shot of that size I made." This testimony was given by Calvert as a witness for plaintiff. On cross-examination by defendant he corroborated Rapp, Nentwig, and Gordon on the point that the amount of "formation" desired to be "exploited" governed the size of the "shot."

The case was tried with a jury. At conclusion of the evidence, defendant requested instruction of a verdict in its favor. That motion was overruled, and the case was submitted upon special issues, in response to which the jury found negligence in shooting defendant's well "with 600 quarts of nitroglycerin at the time, place, and locality," "unreasonableness" in the "shot of 600 quarts" as used "under all the facts and circumstances for the purpose of testing for oil formations in said well"; that plaintiff's well was "damaged" as a result of the explosion "of the 600-quart shot"; that the damage was "caused solely" by that explosion; that the "shot" was the "proximate cause of the salt water coming into the Comanche Duke Oil Company's well"; and that the damage "caused solely" by the "shot" was $30,016. Judgment for plaintiff in that amount, with interest, followed. Upon appeal the honorable Court of Civil Appeals, Fourth District, in consonance with rules of property, stated in its opinion and upon a conclusion that the evidence without controversy harmonized defendant's acts in the use of its property with what was "usually, customarily, and universally done in that oil field," reversed the judgment, and rendered one acquitting it of liability. 274 S. W. 193.

## Opinion.

### I. Basic Rights and Obligations.

[1] As negligence is the violation or disregard of some duty (29 Cyc. 430), the conditions which circumstance the right of the actor and the scienter which ought to induce recognition and observance of the right's correlative are elements for primary consideration in a dispute such as this.

[2] The defendant owned a tract of land. The honorable Court of Civil Appeals pronounced some general rules of property as touching, by way of justification, the use made of that land. We are not disposed to question the general abstract statement of those rules; in the main, we suppose, they are consequential of H. & T. C. R. Co. v. East, 98 Tex. 146, 81 S. W. 279, 107 Am. St. Rep. 620, 4 Ann. Cas. 827; Spann v. City of Dallas, 111 Tex. 350, 235 S. W. 513, 19 A. L. R. 1387; Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S. W. 290, 29 A. L. R. 566; and other like cases. Nevertheless, proprietorship as thus described in the abstract encounters varied restrictions of practical aspect.

(a) The boundary, for example, as delineated on the surface and by the plane struck through the surface line to the earth's center marks off the boundary between right and trespass in respect to locus of user of a claimed right—somewhere on one side lies absolute immunity, and, on the other, absolute responsibility. In illustration, it may be said that one owner could not properly erect his structures, surface or underground, in whole or part beyond the dividing line, and thereby take oil on or in the adjoining tract, or induce that oil to come onto or into his tract, so as to become liable to capture there or prevent the owner of the adjoining tract from enjoying the benefit of such oil as might be in his land or as might come there except for these structures.

[3] (b) Ex vi necessitate, there is an area of a sort of common ownership near the boundary and from surface to center of the earth; that ownership being known as the right to "lateral support." Simon v. Nance, 45 Tex. Civ. App. 480, 100 S. W. 1038; Northern Transportation Co. v. Chicago, 99 U. S. 635, 25 L. Ed. 336; 1 Cyc. 775, 776. Physical invasion of that area, with resultant damage directly attributable to injury to property in or on the adjoining tract, being accompanied by liability absolute or contingent upon lack of due prudence accordingly as the injury may be to the adjoining tract in its natural state or to improvements. Id. E. g., if one owner should drill a well, or otherwise excavate, so that the surface of the walls nearest the adjoining tract should lie in the

boundary plane mentioned, and, as a result, the materials of a natural barrier, which inclosed or protected a natural deposit or stream of oil at the surface or in the bowels of the adjoining tract, crumbled away (of its own weight plus the weight of naturally superimposed earthen materials) and with sequent ruination or impairment of the oil deposit or stream, the act would be comparable to trespass; or if the "adjoining owner" had an improvement on or in his land (say, a cased well) and as a proximate result the improvement were 'injured through destruction of "lateral support," liability would attach if an ordinarily prudent man, thus circumstanced, would not have sunk a well so near the boundary as that supposed. Id.

[4-7] (c) In a sense, one tract of land cannot be used unless there be also consequential user of neighboring tracts. This is sequent of that delicate relationship which Nature has imposed upon the tangible and intangible constituents of earth and air. There are ever present transmitters whereby a force set in motion on or in one tract may be, and probably will be, carried onto or into vicinal tracts. Ownership includes those tangibles and intangibles separately viewed and taken, also, as a congeries of related units. There may be an exceptional case of user of one tract unaccompanied by stirring of a force to be thus transmitted, but in most cases there will be a force set in motion, which, at the behest of natural laws, will communicate itself to the adjoining tract and, pro tanto, cut down a neighbor's possession and enjoyment. The degree of that consequential user may be at any point between the infinities and the result of the most common employment of one tract in the most simple and prudent manner, e. g., A. ploughs his field, or of the most wanton and malicious employment of the tract, e. g., A. uses his field near the boundary as the place to explode a large quantity of dynamite for the sole purpose of annoying his neighbor, injuring his person, or shaking down his building. In the first exemplification, there is disturbance of earth and air and transmission of shock into the earth and air of the neighboring tract in the same manner as in the second, but in infinitely different quantum of force and responsibility. Varied (if not myriad) examples lie in the use of fire on one tract with ultimate conflagration on another resultant of transmission of sparks by air or of the fire by surface inflammables; other examples inhere in the use of explosives. Because of the inevitable (at least, the probable) consequential user, there is always a point at which proprietorship, in the full range of its abstract concept, meets that temperance exhorted in the maxim sic utere tuo ut alienum non lædas. Spann v. City of Dallas, supra; B. & P. Ry. Co. v. Fifth Baptist Church, 108 U. S. 317, 331, 2 S. Ct. 719, 27 L. Ed. 739. That meeting results in a paradox; the effect is not to prevent a man from properly using his land although the user may carry damage to his neighbor's land, but it is to prevent user of one tract as the medium of infringing a neighbor's legal rights. Newell v. Woolfolk, 91 Hun, 211, 36 N. Y. S. 327; Benner v. Atlantic Dredging Co., 134 N. Y. 156, 31 N. E. 328, 17 L. R. A. 220, 30 Am. St. Rep. 649. Processes of dry logic halt at platting a line whereby that which is permitted and that which is forbidden are laid to respective sides (even as it halts in allocating degrees in causation and required prudence and at absolutism in many other jural subjects) and impel us to be content with the general pronouncement that injurious results of the consequential user are damnum absque or damnum injuria, and absolutely so or contingent upon exercise of due prudence, as circumstances may require. Yet the law, in its practical workings, we apprehend, thus resolves many of the seeming contradictions. If the purpose be lawful, physical trespass absent, primary use reasonable, and manner of that use duly careful, consequences are damnum absque; otherwise, injury within proximate causation is redressable. This would appear to have support in "blasting" and "explosion" cases (see Ft. W. & D. C. Ry. Co. v. Beauchamp, 95 Tex. 496, 68 S. W. 502, 58 L. R. A. 716, 93 Am. St. Rep. 864; 11 R. C. L. 673, 674; 19 Cyc. 7, 8), in which liability for injuries produced through vibration and shock alone is made to turn upon use or omission of due care in starting the vibrative or concussive waves, and in "fire" cases (see Seale v. G., C. & S. F. Ry. Co., 65 Tex. 274, 57 Am. St. Rep. 602), upon caution observed or forgotten in the act which started or which failed to halt the elements in its journey to neighboring premises.

(d) Because the parties, the trial court, and the Court of Civil Appeals have done so, and because a determination is not presently essential, we refrain from considering whether there be evidence tending to show a condition of absolute liability, and dispose of the case upon the questions of existence or not of issuable negligence and causation. We have adverted to what are perceived to be conditions of absolute liability because those conditions involve some scienter and thus have a bearing upon the quantum of diligence required to meet the substantive test of "ordinary care."

[8, 9] (e) Plaintiff owned the adjoining tract of land. One hundred and fifty feet south of the surface boundary it had drilled and perfected a well which reached a deposit or stratum of oil, and oil was being produced in profitable quantities. Defendant then located and drilled its well 150 feet north of the common boundary at a point 300 feet due north of plaintiff's well. Satisfactory results were not obtained by drilling, and defendant decided upon further "exploitation" of what was supposed to be oil-bearing

strata. Manifestly, the right to make that exploitation existed; but, as plainly, in exercising the right the duty to avoid altogether physical invasion of plaintiff's land or the area of "lateral support," and the duty otherwise to avoid disturbance of possession and enjoyment of plaintiff's land except in so far as that disturbance might be reasonably essential to defendant's proprietorship coexisted, and this, in view of the locus and nature of the operation contemplated, put defendant to prudent choice of implements. If picks, shovels, sledges, or drills had been chosen, due care would have been exacted in determining the sizes, etc., and use thereof, their amenability to human control after once set in motion notwithstanding. And accordingly as the implement, set in motion, would defy control, the quantum of diligence in its selection for use would correspondingly increase, for while the standard of conduct which the law prescribes (here, we suppose, "ordinary care") does not change, it does exact a measure of caution appropriate to the danger involved and, accordingly, may justify as extremely prudential an act or omission in one set of circumstances and denounce as reckless a like act or omission differently conditioned. Hays v. Railway Co., 70 Tex. 602, 605, 8 S. W. 491, 8 Am. St. Rep. 624; Railway Co. v. Smith, 87 Tex. 348, 28 S. W. 520; Railway Co. v. Gormley, 91 Tex. 393, 399, 43 S. W. 877, 66 Am. St. Rep. 894; Ft. W. & D. C. Ry. Co. v. Beauchamp, supra; Nitroglycerin Case, 15 Wall. 536, 21 L. Ed. 206; Frankford & B. Turnpike Co. v. Philadelphia, etc., Ry. Co., 54 Pa. St. 345, 93 Am. Dec. 708.

[10] (f) To achieve user of its land so as to alter the natural relationship and positions of the earthen constituents in the hope that such user would enable it to discover and capture oil, or to induce oil to come there from other lands so as to be subject to capture, defendant chose nitroglycerin as the implement. That choice was made with presumed scienter that a most dangerous tool was being selected (11 R. C. L. 653, 654), for that quality had rested in common knowledge since the explosion whose lamentable results became the subject of litigation in the nitroglycerin cases (one of which is reported in 15 Wall. 524, 21 L. Ed. 206), as well as with actual knowledge that any given quantity had great destructive power, and that a substantial quantity was appropriate to the "shattering" of "black lime"—"sometimes harder than steel"—for the company had been using it for that purpose throughout a considerable period of time. And there was other important knowledge and conscious ignorance. The ranges of the destructive force in any given conditions was unknown and incalculable, as was the degree of its diminishing with distance and variance in resistive qualities of opposing materials; the nature of the materials of the various strata in the company's well was known, for that was shown in general by the log, but great diversities of strata and of materials in the vicinity of that well were shown by the log of plaintiffs and the logs of at least two other wells theretofore drilled within a radius of 600 feet, and at what points, if any, those diversities merged into uniformity was unknown; that salt water was the natural enemy of oil at rest or percolating in the ground, and that it lurked in considerable volume in the immediate vicinity was known, but its volume and the form or location of its deposits or percolations were unknown; and (in one view of the testimony) it was known that plaintiff had avoided or conquered the problem of salt water in respect to its well, as had been done by others in respect to wells in the immediate vicinity. The enterprise, then, involved bringing onto the defendant's tract an alien substance and the unleashing there of its great power upon earthen transmitters, where, at the behest of natural laws, a portion of the force would "naturally" and "probably" be carried into the adjoining tract. In our view, it is extremely questionable whether it could be said, as a matter of law, that an absolute right to employ nitroglycerin of any quantity existed, but the case as presented does not require determination of that question, and we pretermit it upon the arguendo concession that such a right did exist.

[11] But with that right assumed, defendant was put to choice of the amount of nitroglycerin to be used—even as it would have been compelled to choose the dimensions of picks, shovels, and drills—and assumed the obligation to use at least ordinary care in making the selection.

## II. Hypotheses of Lack of Due Care.

[12, 13] (g) Negligence "may consist in doing something which ought either to be done in a different manner or not at all." Halsbury's Laws of England, "Negligence," § 828. Drilling of defendant's well had been completed some time prior to December 12, 1919; on that day a "shot" of 200 quarts of nitroglycerin was exploded in the well, inferably below the 3,641-foot level; 8 days later the "shot" about which this controversy arose was exploded between the 3,429 and 3,641 foot levels. Plaintiff's well was "shot" with 210 quarts (170 quarts, according to one witness) July 19, 1919, and again with 270 quarts (210 quarts, according to one witness) on July 26, 1919; as a result of the first "shot" it became a producer of oil, and as a result of the second (or of both) it became a profitable well, according to the testimony of all the witnesses, and the "best well" in the vicinity, according to the estimate of defendant's district superintendent. The "Bowhead" well, 300 feet due west of plaintiff's well, had been "shot" twice (once with 80 quarts and once with 270 quarts) within a short time prior to December 12, 1919; it

became a substantial producer of oil. Although specific data touching dates, locations, etc., was not given, defendant's expert witnesses related instances of wells in that field having been "shot" twice and thrice. Upon cross-examination by counsel for plaintiff, Mr. Gordon, qualified as an expert by defendant (and whose experience had accrued in its service), was asked:

"If you have a 200-foot structure that you want to shoot, you can shoot 50 feet of it at one time, and 50 at another, and 50 at another, can't you?"

He answered:

"It would probably take you 12 months to get through and clean out after the second shot, third shot, and fourth shot. You would run the risk of destroying your hole before you completed your 300 feet. In other words, that would be an absolutely impracticable way of handling it. I suppose that could be done."

Manifestly, a jury would be authorized to find the means of successive "shots" of smaller amounts (as contrasted with one large "shot") to be a possible way of accomplishing the purpose in mind; i. e., of "exploiting" a given "formation." And touching practicalities, the circumstances just detailed offered possible refutation of Mr. Gordon's foreboding judgment. Warrant, then, existed for a conclusion that the alternative and obviously less dangerous method was reasonably available, and it cannot be said, as a matter of law, that defendant did not omit due care in the choice of the more perilous one. Newell v. Woolfolk, 91 Hun, 211, 36 N. Y. S. 327.

[14-17] (h) Due care, no doubt, involved good-faith observance of all relevant data and its lessons, including what was known and what was consciously unknowable about the qualities of the explosive and of the area in which its force was to be exerted, for there is a general obligation upon men to employ their senses in a humanitarian direction, as witness the foundation of "discovered peril," on the one hand, and "last clear chance," on the other. A proper corollary is that the quantum of applied intelligence must increase with warning that the actor may be putting another man, or another man's property, in danger. 20 R. C. L. "Negligence," §§ 24, 26, 47, 48, and cases there cited. Calvert had been district superintendent of defendant's operation in Stephens county for a considerable period before December 19, 1919. He "had shot, seen shot, and superintended the shooting of approximately 45 wells" for it in that territory. It was a part of his duty to "keep up" with operations there, whether carried on by his company or others, and this duty he performed. Agents of plaintiff apparently had learned that a "600-quart shot" was in contemplation, and they protested its use—the protest being made to Calvert. Thereupon, he protested to his superior the

use of that quantity; his protest was overruled, and he was directed to use the 600-quart "shot," and he "did so." Hence exact matter of the probable (at least, the possible) effect of a "shot" of that size was actually considered. Touching that point, therefore, we do not have a case of mere inadvertence; whether there would be a distinction otherwise need not be considered, for here there was consciously active scienter of possible disaster which ought to have stirred the faculties to closest scrutiny and weighing of relevant data.

[18] That which determined 600 quarts as the amount of explosive to be used, it is said in justification, were two factors; namely, existence of a "formation" between the 3,429 and 3,641 foot levels which defendant desired to "exploit" and the nature of that "formation"—these things, it is said, automatically fixed the quantity. That formula, of course, involves the presupposition that an owner has the absolute right to decide upon the amount of "formation" to be shattered at one charge, and that, of course, is unsound unless, perchance, the "shot" is to be made in a desert place. We mention the factors here because of their effect upon certain evidence with which the jury had to deal.

[19, 20] Mr. Gordon said that the "amount of formation" generally "controlled the shot," and in this he was corroborated by the usage testimony of defendant's witnesses Rapp and Nentwig et al. While there is circumstantial evidence of different import, there is also evidence tending to show that here 600 quarts were selected and used upon an assumption that between the levels mentioned there existed a continuous stratum of "black lime"; e. g., the written report of the "shot" made by Calvert shortly thereafter includes statements that the area of the "shot" was between those levels and was "212 feet" of "black lime." Yet the log of the well, then before the company, disclosed nonexistence of such a stratum, for it showed five different strata between the 3,429 and 3,641 foot depths: First, "black lime" from 3,415 to 3,-450 feet (14 feet of this stratum being above the 3,429-foot level); second "black shale" from 3,450 to 3,489 feet; third, "black lime" between 3,489 and 3,570 feet; fourth, "black shale" between 3,570 and 3,620 feet; and, fifth, "limestone" (not "black") from 3,620 to 3,641 feet. "Black lime" appears to be the hardest of natural substances in that territory, according to Mr. Gordon's testimony it is "sometimes harder than steel"; and the experts agreed upon the proposition that a given amount of nitroglycerin would "shatter" "black lime" within a smaller area than the area "shatterable" by a like amount exploded against softer materials. Conceivably, it may be true that 600 quarts exploded against an unbroken stratum of "black lime" might not carry, or might not be expected to

carry, the force in high degree across a boundary 150 feet away, while intervention of strata of less resistive qualities might project it that distance in highly destructive measure. Before the jury, then, this evidence wore a double mien. If as believed there was a good-faith effort to observe the factors which, it is said, automatically determined the quantity, the jury must then have believed there was a mistaken reading of the log in attempted ascertainment of one of the factors, or, if it believed the log was correctly read, it must have believed that the warnings of its data were ignored; the result, in either event, was the use of a "shot" thought appropriate to a stratum of "212 feet" of "black lime" in an area, having, in fact, less resistive constituents. In the one event, there would be a contributing ignorance of a fact which ought to have been known and, as known, observed; in the other, unexplained and unwarranted disregard of a known fact. If the log had been correctly read and its data properly observed, these facts of themselves would not have established due care, for "it is a mistake to say * * * that if the man on the spot, even an expert, does what his judgment approves, he cannot be found negligent." The Germanic, 196 U. S. 589, 25 S. Ct. 317, 49 L. Ed. 610. But if "the man on the spot," charged with the use of his senses and the duty of discovering whatever perils are reasonably ascertainable, does something which his judgment disapproves or approves something, because of unexplained or otherwise unjustified ignorance of an important fact, there is evidence of negligence; and if, in fact, he be an expert, that evidence is all the more cogent in its denunciation.

[21] (i) Defendant averred and undertook to prove a "custom" and conformity thereto in justification of the "shot" of December 20, 1919. Its acquittal in the Court of Civil Appeals rests upon successive postulates of existence of a "custom" and established conformity which precludes wrongdoing. Because of that defense we have set out in the statement of the case the evidence bearing upon the subject.

[22] It is easily conceivable that "customary practices" might of themselves be unlawful or unreasonable or include negligence. G., C. & S. F. Ry. Co. v. Evansich, 61 Tex. 3; Fletcher v. Railway Co., 168 U. S. 135, 18 S. Ct. 35, 42 L. Ed. 411. They might include too much; contrarily, they might include too little in a failure to observe those new things which an ordinarily prudent man would do in response to advanced learning and skill. Brunke v. M., K. Tel. Co., 115 Mo. App. 36, 90 S. W. 753, 754. In the next place, when usage testimony becomes admissible in a dispute beyond the contract field, its purpose is not to fix the standard of conduct, but it is to give evidence to the trier of fact issues to aid him, in so far as it may, in applying the standard of conduct which the law itself prescribes. Cameron Compress Co. v. Whitington (Tex. Com. App.) 280 S. W. 527; T. & P. Ry. Co. v. Behymer, 189 U. S. 468, 23 S. Ct. 622, 47 L. Ed. 905; Wabash Ry. Co. v. McDaniels, 107 U. S. 454, 2 S. Ct. 932, 27 L. Ed. 605.

[23, 24] The basic element of the supposed "custom," agreed upon by all the experts, including Mr. Gordon, is this: "The usual shot depended on the thickness of the formation which the owner desired to exploit." Desires in that respect, of course, would be as numerous as owners and as varied as personalities; with a conscious knowledge or apprehension of impending ruin to neighboring property, an owner, adequately selfish, might desire and undertake the shooting of a "formation" of extremely large dimensions at one charge. Unless perhaps in exceptional cases, the maxim noted would not permit license commensurate with the basic element of the "custom." Naturally, too, the wide range allowed individual desires and judgments is preclusive of that generality essential to a proper custom or usage. Again, Mr. Gordon testified that the "usual shots were anywhere from four to six to seven and eight hundred quarts in shooting a well"; while Nentwig first said that a "shot of 600 quarts * * * in an oil well in that territory was an ordinary and customary shot," he testified that "our usual shot was not about 80 quarts at that time, we were shooting 40 quarts in some of them, and 60 quarts in some of them, and 80 quarts in some of them, and in some 120;" Crow said that "he thought the average of the shots in that territory would be around 300 quarts;" Calvert had never used as much as 600 quarts in shooting or in superintendence of shooting for defendant and "protested" the quantity; Stone had never heard of a larger shot than 400 quarts used in Stephens county, except in defendant's instance. The testimony just mentioned, and more of like kind, illustrates various things. If believed by the jury, it destroyed the effect of the more general statements that 600 quarts was "an ordinary and customary shot"; it but emphasized the fact that the size of any charge rested in the pleasure of the well owner; and in a permissible view it afforded direct contradiction of defendant's averment of conformity to whatever usage there was, for the fact of its use of 600 quarts, or more, is not disputed.

The averment and attempted proof of custom and observance, then, were insufficient to sustain a claim of immunity, at least in a conclusive sense.

But the evidence is in the record without challenge at its introduction or since, and it must be considered that the jury had the right to weigh it in its bearing upon negli-

gence vel non as otherwise made issuable in the respects above noted.

### III. Proximate Cause.

[25] Lack of issuable causation is reasserted by defendant in support of the judgment of the Court of Civil Appeals, and, since proof tending to show proximate cause is as essential as is proof of negligence (T. & P. Ry. Co. v. Bigham, 90 Tex. 223, 38 S. W. 162), that claim must be re-examined (Holland v. Nimitz, 111 Tex. 419, 232 S. W. 298, 239 S. W. 185).

[26] The fact of use of a large alien force with scienter that a portion of it would, in obedience to natural laws and by natural means, inevitably reach across the boundary supplies the element of "naturalness," or "probability," as that element is known in the law of causation. See T. & P. Ry. Co. v. Bigham, supra; Milwaukee Ry. Co. v. Kellogg, 94 U. S. 469, 24 L. Ed. 256. That fact and that scienter, plus knowledge or notice that the degree of alien force as it should cross the boundary might be of destructive measure so as alone or in concurrence with one or more contributing forces (other than the injured person's wrong) such, e. g., as vicinal presence and movement of salt water, to produce some such injury as that complained of, make up a basis for whatever foreseeability, or anticipation, is required in proximate causation. Id.; Seale v. G., C. & S. F. Ry. Co., 65 Tex. 274, 57 Am. Rep. 602; O'Connor v. Andrews, 81 Tex. 28, 16 S. W. 628; G., C. & S. F. Ry. Co. v. McWhirter, 77 Tex. 356, 14 S. W. 26, 19 Am. St. Rep. 755. Hence the question on this branch of the case is narrowed to one of causa causans. Is there evidence of the explosion as an efficient cause?

[27] Plaintiff had a well located, as stated, 300 feet south from defendant's well. That plaintiff's well had been producing oil ("flowing by heads" at "frequent intervals") in paying quantities since July 26, 1919, and up to some day in December, 1919, and that on such day in December it was ruined, or its value substantially impaired, by appearance (in its oil-producing parts) of salt water is not questionable.

About the exact date of that appearance there is a conflict of testimony. The version of defendant's witnesses Stone and Mohler is that the occurrence, in point of time, immediately followed a "shot" exploded in the "Bowhead" well, located, as shown, 300 feet due west of plaintiff's well. That date is not fixed except circumstantially, and that by approximation rather than to certainty. Drilling of the "Bowhead" was finished December 4, 1919—this fact being shown in the log prepared by Hivick & Mohler—and there is evidence that its "shot" preceded the "shot" in defendant's well December 20, 1919. Hence the "shot" in the "Bowhead" intervened De-

cember 4 and December 20, 1919. According to the testimony of Stone and Mohler, plaintiff's well during the 40 minutes immediately preceding the ruinous appearance of salt water made a "big flow" of oil, and thereafter some oil was produced from it, but only by means of "swabbing." In the other version (testimony of Cruey, the Moores, and Comer), plaintiff's well is shown as having made a "big flow," lasting 2 or 3 hours, immediately before the appearance of salt water in its producing parts, and after cessation of that "flow" as having produced small quantities of oil at infrequent intervals with the aid of "swabbing"; but in this version the time of commencement of the "big flow" is definitely made coincident with the explosion (about 5 o'clock a. m., December 20, 1919) in defendant's well. Except as to identity of the "shot" which was the immediate chronological forerunner of the "big flow" and sequent appearance of salt water, and except for differences in estimates of the time consumed in the "big flow," there is, as seen, substantial agreement. Whether the one version or the other is the more accurate is a familiar jury question. Manifestly, the jury believed Cruey et al., and rejected Mohler and Stone on the points of difference. Thereby, too, the "Bowhead" well and its shooting were, of necessity, rejected as sufficient cause of the altered conduct of plaintiff's well.

[28] The process and effect of "swabbing" as detailed by plaintiff's witnesses have an important bearing, and their testimony, except as to the date of commencing the process and as shown above, is not contradicted. Within a few days after the "shot" on December 20th, plaintiff's agents began to "swab" its well; i. e., to work in the well a kind of pump, in an effort to produce oil. The result of "swabbing" throughout some several days was the temporary exhaustion of salt water to an extent sufficient to enable the capture of some oil near the bottom of the well, according to the testimony of Cruey. Defendant indulged in a like effort in its "Harrison No. 2" on occasion, and when both parties would thus pump out salt water its volume would be so lowered as to enable plaintiff to get oil, at intervals, at the rate of 50 to 100 barrels per day, according to the testimony of Mr. Comer; but he said, "Whenever the defendant would stop pumping its well, we could not get any oil." Plaintiff's efforts thus to produce oil continued with indifferent success throughout several months and until abandonment of the well. Data touching the amount of oil thus produced will be given in another connection.

Mohler and Stone testified that whatever water was encountered in drilling plaintiff's well was "cased off" (i. e., cased out of the oil-producing parts) so that no water "trouble" appeared until a considerable time after completion—as shown, immediately follow-

ing the "Bowhead" shot. The testimony of Cruey and Comer is to the same effect, except, as shown, they said the "trouble" appeared immediately following defendant's "shot." The log of the well contains no reference to water below the 2,700-foot level. In another connection it has been shown that the first "shot" in defendant's well was exploded December 12th. In response to that "shot" salt water arose in defendant's well and stood there at a level of 300 feet above the bottom, according to Mohler's testimony; Calvert said that the well was filled with a "fluid or waste" (not "composed entirely of salt water") to a point 3,000 feet above the bottom. If a passageway had been available, as a matter of probability if not certainty, this water or "fluid" would have communicated with plaintiff's well; yet during the period intervening December 12 and December 20, it remained away from that well, if Comer, Cruey, and Moore be credited in the respects already noted. And after the explosion December 20th water in both wells belonged in a common body or stream, if Comer is believed, for pumping water out of defendant's well had the effect of decreasing the volume in plaintiff's well. There is basis, then, for saying that the explosion opened a passageway.

That permissible conclusion has support in another circumstance. Calvert and Cruey were shown to be men of considerable experience in that and in other oil fields, and to be familiar with the qualities of nitroglycerine, exploded and unexploded. They knew the "scent" of exploded nitroglycerin. The substance or composition had not been used in plaintiff's well since July 26th, but within 2 or 3 hours after the "shot" in defendant's well (December 20th) they discovered the fumes of exploded nitroglycerin coming from the mouth of the oil-producing part of plaintiff's well, they said. It is shown that defendant's well "bridged tight" at about the 800-feet level with the explosion, and this, of course, had a tendency to force lateral underground escape of the fumes.

As shown, there had previously been two shots exploded in the Comanche Duke well and, also, in the "Bowhead." These wells were 300 feet apart. With disbelief in the testimony of Mohler and Stone about the time of the appearance of salt water in the Comanche Duke, the jury might properly have believed that a shot of 270 quarts would not laterally exert its breaking force beyond a point 150 feet distant, for with that disbelief the fact would be established that the "Bowhead" shots had no effect on the Comanche Duke well, although similar shots had previously been fired in the latter. Hence it was rightly inferable that a passageway in the direction of defendant's well was not opened to the common boundary by the shots in the Comanche Duke and, perforce,

that the much larger shot in defendant's well opened the way in the direction of the Comanche Duke and beyond the boundary. This has support beyond the circumstances just mentioned. Calvert judged that a shot of 600 quarts would "break up the structure 6 times as hard" as a 100-quart shot. His estimate has some contradiction in those of other experts and some confirmation in Gordon's testimony to the point that a "little shot" will get the "cracking effect" in a "sand," whereas it requires a "much heavier shot in the black lime, one being very much harder than the other—the thickness of the formation governs the length of your shell, and the hardness governs the diameter of the shell." Again, Calvert insisted that "Harrison No. 4" (300 feet east) had been completed as a "producing well" before the shot in "Harrison No. 2," and that with the shot it "stopped producing oil" and was "destroyed" by the letting in of salt water. There is some contradiction of his testimony in that respect, but the jury were at liberty to believe him, and, if he was credited, his testimony afforded basis for saying that the 600-quart shot was sufficient to open a passageway to the well 300 feet to the east—a distance twice that to the common boundary on the south. .

[29] A juror ought not close his vision to the ordinary workings of the most commonly accepted natural laws or forget the basic truths of science with which all men are in fact or are presumed to be familiar. Hence, if he believed the testimony by which the conditions stated were shown, it was his province to say (a) that up to the explosion on December 20th some kind of natural barrier (at or south of the common boundary) intervened the two wells sufficient to obstruct and prevent the passage of water between the two holes, and (b) that the barrier (by that explosion) was broken to the extent of allowing passage into the one well of salt water deposited in some form at or near the other. Perforce, the juror might properly regard the opening of that passageway as a cause, and the immediately sequent conduct of plaintiff's well might be taken in demonstration of the efficiency of that cause.

[30] The honorable Court of Civil Appeals called attention to "evidence, embraced in an agreed statement of the pipe line runs from the well, that the average daily production for the month next following the shot was greater than that of the month next preceding the shot, and that of the second month was heavier than that of the first, after which it decreased irregularly until the well was abandoned 2 years later." "There was no effort," it was said, "to explain this queer and inconsistent conduct of the well, unless the explanation is supplied by the mere happening of the events following the explosion, and that explanation does not suffice." Underlying that view, however, is

the assumption that actual "conduct" of the well had witness in the pipe line runs as and when made, and basis for that postulate is negatived in the evidence. As we read it the testimony of Moore, Cruey, and Comer discloses an effort to explain the "queer and inconsistent conduct of the well" and a sufficient explanation if these witnesses be credited. For, they said, there were storage facilities at the well exceeding 3,100 barrels in capacity. On no one day were there pipe line "runs" amounting to as much as 3,100 barrels, if the "agreed statement" be correct. All of the oil produced and saved was ultimately "run" to the Prairie pipe lines; in taking the oil that company used a pump to convey it from plaintiff's storage to the line; this pump was out of order on many occasions and, thus, regular "runs" (even needed "runs") were sometimes delayed or prevented altogether; again, the period in question was also the period of claimed "overproduction" in that and in other Texas fields during which there was but a general taking of a portion of the oil actually produced, and because of this, on occasions, the pipe line company would not or could not take all of plaintiff's oil which was in storage or as and when produced; hence, it was said, it was necessary, on occasion, for plaintiff to allow oil as produced to accumulate in storage to be "run" as and when the Pipe Line company could or would take it, and when the storage facilities would become filled through these accumulations it was necessary for plaintiff to "stop" production until necessary "runs" could be made. Manifestly, then, oil produced in one month was often "run" in a different month; e. g., it is unquestioned that the storage was about filled with oil produced in the latter part of July, 1919, yet the first "run" occurred August 5th; the last "run" in December, 1919, was on the 15th, yet substantial quantities (certainly more than 1,000 barrels) were produced and put in storage between the 15th and cessation of the "big flow" on December 20th, all of which, plus what was in storage upon cessation of the "run" on the 15th, had to be "run" in months subsequent to December, 1919. According to Cruey and Comer, there was but little, if any, oil produced in December subsequent to cessation of the "big flow" on the 20th, and but little produced in January or February, or subsequently, in 1920; e. g., Cruey said

they began "swabbing" after the "big flow" had ceased, and that after "15 or 20 days' swabbing," on occasion, they would get oil and water together; this witness and Comer estimated that from 50 to 100 barrels per day during the intervals in which it was producible at all would be saved by "swabbing." The amount of oil "run" in January and February, 1920, i. e., the "first" and "second" months referred to by the Court of Civil Appeals, was in substantial part, certainly, oil which had been put in storage prior to cessation of the "big flow" on December 20th, and in substantial part, probably, oil which had been produced even before December 15th.

[31-33] "The operations here complained of," it was said, "occurred more than three-fifths of a mile beneath the surface of the earth, and it is not contended that any one knows, or could possibly determine, whether the source of oil tapped by appellee's well was reduced or its volume materially affected by the explosion in question." A litigant, however, is not required to prove his cause or defense to the extent of certainty, otherwise, e. g., a personal traumatism recklessly or wantonly inflicted would not bring into the jural sphere its elements of *future* pain and impaired earning capacity, but if, in the proof, certainty is reached, that event dispenses with the ordinary jury use. Practical administration of justice includes the hypothesis of a juror as the ordinarily intelligent man, distinguished from the dolt as from the paragon, to whom is left, as it must be left somewhere, a considerable field of deduction. Texas Employers' Ins. Co. v. Shilling (Tex. Com. App.) 289 S. W. 996. And the litigant, with proof of the kind of which the nature of the case permits (in this instance and on this point, circumstantial), makes a fact issue at least when he advances to reasonable probability.

In our opinion, there is evidence, more than a "mere surmise," of the 600-quart "shot" as an efficient and probable cause and of whatever foreseeability is requisite in essential proximity of causation.

We recommend that the judgment of the Court of Civil Appeals be reversed, and that the judgment of the district court be affirmed.

CURETON, C. J. Judgment of the Court of Civil Appeals reversed, and that of the district court affirmed.