# THE NITRO-GLYCERINE CASE.

### [PARROT v. WELLS, FARGO & CO.]

1. In 1866 the defendants, who were expressmen engaged in carrying packages between New York and California, by way of the Isthmus of Panama, received at New York a box containing nitro-glycerine to be carried to California. There was nothing in the appearance of the box tending to excite any suspicion of the character of its contents. It was received and carried in the usual course of business, no information being asked or given as to its contents. On arriving at San Francisco, California, its contents were leaking and resembled sweet oil. The box was then taken for examination, as was the custom with the defendants when any box carried by them appeared to be damaged, to the premises occupied by them, which were leased from the plaintiff. Whilst a servant of the defendants, by their direction, was attempting to open the box the nitro-glycerine exploded, injuring the premises occupied by them and other premises leased by the plaintiff to, and occupied by, other parties. The defendants had no knowledge of, and no reason to suspect, the dangerous character of the contents. They repaired the injuries to the premises occupied by them: *Held*, that they were not liable for the damage caused by the accident to the premises occupied by other parties.

2. Common carriers are not chargeable, in cases free from suspicion, with notice of the contents of packages carried by them; nor are they authorized, in such cases, to require information as to the contents of the packages offered as a condition of carrying them.

3. Where there is nothing to excite the suspicion of a common carrier as to the contents of a package carried by him, it is not negligence on his part to introduce the package, when appearing to be damaged, into his place of business for examination, and to handle it in the same manner as other packages of similar outward appearance are usually introduced for examination and handled.

4. The measure of care against accidents, which one must take to avoid responsibility, is that which a person of ordinary prudence and caution would use if his own interests were to be affected and the whole risk were his own.

ERROR to the Circuit Court for the District of California.

Parrot brought an action in the court below against certain defendants who composed the well-known firm of Wells, Fargo & Co., express carriers, to recover damages for injuries to certain large buildings owned by him in the city of San Francisco, caused in April, 1866, by the explosion of

nitro-glycerine whilst in charge of the said defendants. The action was originally begun in the State court of California, and was thence removed, on motion of the defendants, to the Circuit Court of the United States, where it was tried by the court without the intervention of a jury, by stipulation of the parties, under the recent act of Congress.

The complaint contained four counts. The first, was for technical waste by the landlord against his tenant from year to year, based on a statute of California. The waste was charged to have resulted from negligently introducing an explosive substance, &c., and treble damages were claimed.

The other counts were for injuries to premises demised to the defendants, and to the reversionary interest of the plaintiff in premises demised to other tenants, caused by the defendants, by themselves and their servants carelessly, negligently, and improvidently introducing upon the premises occupied by them, a box containing the explosive substance, and so carelessly, negligently, and unskilfully examining, handling, moving, and striking the box as to produce the explosion of the substance, causing the injuries complained of.

The answer joined issue on all the material allegations of the complaint; also set up a lease under which defendants occupied, and a right to carry on the business of expressmen in the demised premises; and also averred a repair of the demised premises, before suit brought, to the satisfaction of the plaintiff and with his approbation.

The facts of the case as found by the court were substantially these:

The plaintiff, being owner of the buildings injured, let, in November, 1855, *a portion* of them—the basement and first floors with the vaults and banking fixtures therein, together with a brick warehouse in the rear—to the defendants for a term of two years from the first of January, 1856. The lease contained covenants that the lessees would not receive in the demised premises, either for their own account or on storage, or allow any person to place therein "gunpowder, alcohol, or any other articles dangerous from their combus-

tibility;" that they would, during the term of the lease, "occupy the premises solely for the business of their calling," which was that of bankers and expressmen, and at the expiration of their term would "quit and surrender the said demised premises with all the fixtures therein contained in as good condition as the reasonable use and wear thereof would permit, damages by the elements excepted." The rent stipulated was $12,000 a year, payable in monthly instalments of $1000 each month in advance. The lease was on two occasions subsequently renewed on the same terms, once for two years from January, 1858, and again for two years from January, 1860. After the expiration of the latter term the premises were held over from year to year with the assent of the plaintiff, though without any special agreement on his part, and were thus held on the 16th of April, 1866, when the injuries complained of were caused, the defendants paying rent in accordance with the terms of the original lease. *The remaining portions of the buildings—being mostly portions above the part occupied by Wells, Fargo & Co.— were at the time let to other tenants.*

The premises occupied by the defendants were used by them for their business, as stipulated in the lease. They were engaged in the business of public express carriers in the States and Territories of the Pacific coast, and between New York and San Francisco by way of the Isthmus of Panama, using on the latter route the steamships of the Pacific Mail Steamship Company, running between New York and Aspinwall on the Atlantic side, and Panama and San Francisco on the Pacific side, to convey their express matter, and transporting the same across the isthmus by the Panama railroad. In 1866 the steamers left New York on the 1st, 11th, and 21st days of each month, and it was a regulation of the company that no express freight should be received at the wharf in New York on those days. On the afternoon of March 11th, 1866, and after the steamer sailing that day had left for Aspinwall, a man brought to the wharf from which the steamer had taken her departure, a case to be carried to California, and asked an employé of the defend-

ants to receive it for that purpose.  The employé informed him that it was too late to receive freight on that day, but that he could leave the case at his own risk and come the next day and get a receipt.  He thereupon placed the case on the dock opposite the freight office of the company. The employé noticed at the time that the case had not been marked or strapped, as required by the regulations of the company, and called the man's attention to the omission; whereupon he requested the employé to mark and strap the case at his expense.  The case was accordingly strapped as required, and was marked with the proper address of the person for whom it was intended in California.  Two days afterwards the man returned and obtained a receipt from the proper clerk of the company.  The case remained on the dock where deposited till the next steamer left New York, when it was taken with other freight.  At the time the case was presented it was clean and appeared to be in perfect condition.  There was nothing in its appearance calculated to awaken any suspicion as to its contents.  It required strapping and marking, and when this was done it was in proper condition for shipment.  The case was an ordinary wooden box about two and a half feet square, and weighed three hundred and twenty-nine pounds.  Nothing was said upon its delivery, or upon taking the receipt afterwards, or at any other time, about the contents of the case to the defendants, or to any of their employés, nor were any questions subsequently asked by any one respecting the contents.  The case was shipped for California with a large quantity of other express freight, amounting to several thousand cases, on the steamer that left New York on the 21st of March, 1866.  It was carried to Aspinwall, thence transported over the Panama railroad, reshipped on a steamer at Panama, and arrived in San Francisco on the 13th or 14th of April.  On the afternoon of the 14th it was taken from the steamer and placed upon the wharf, when it was discovered that the contents were leaking.  These contents had the appearance of sweet oil.  Another box of similar size had been stained by the contents leaking and appeared to

be damaged.  On the 16th of April, in accordance with the regular and ordinary course of the defendants' business, when express freight is found to be damaged, the two boxes were taken to the defendants' building, the premises in question, for examination.  The agent of the steamship company was requested to send a representative to be present at the examination so that it might be determined, if possible, by inspection, where the responsibility rested between the two companies for the injury to the case.  A representative of the company accordingly attended, and in his presence, and in the presence of an agent of the defendants, and of other persons, an employé of the defendants, by their direction, with a mallet and chisel, proceeded to open the case, and while thus engaged the substance contained in it exploded, instantly killing all the parties present, and causing the destruction of a large amount of property, and the injuries to the buildings occupied by the defendants, for which the present action was brought.  Upon subsequent examination it was ascertained that the substance contained in the case was nitro-glycerine or glonoin oil.  The other box contained silverware.

Nitro-glycerine, according to the account given of it in the record, in its pure condition, is a nearly colorless substance, but when impure it has the color and consistency of sweet oil.  It is a liquid which, under some conditions, explodes with great violence, its explosion being produced by percussion and concussion, and by a high degree of pressure, but not by contact with fire.  If a flame be applied it will burn slowly without exploding, and if the flame be withdrawn it will cease to burn.  It will also explode upon being subjected to a heat of 360 degrees Fahrenheit, and in explosion combustion takes place.  When kept in closed vessels it gradually decomposes, and in decomposing disengages gases, the pressure alone of which may cause an explosion.  In this case the nitro-glycerine in some of the cans in the case had become partially decomposed, generating gases and producing pressure within the cans and a tendency to explode.  In this condition of decomposition the percussion or concussion

caused by opening the box with the mallet and chisel, operating in connection with the internal pressure, produced the explosion.

The discovery of this substance was first announced at Paris, in 1847, but, prior to 1864, experiments with it were confined almost entirely to the laboratory of the chemist. It was manufactured only in small quantities for scientific purposes. In that year a gentleman in Europe by the name of Noble suggested that it might be used for blasting purposes, and in the following year he made experiments with it, demonstrating its extraordinary power, and succeeded in introducing it to a limited extent into some of the European quarries and mines. An account of its properties was also published during that year in England and in a scientific periodical in New York. In 1866, a few weeks before the explosion which has given rise to this case, a shipment of the article from Noble arrived in San Francisco. Efforts were making by the consignees to draw public attention to it for blasting purposes, when the explosion at the office of the defendants took place. A second shipment from the same person to the same consignees, made from Hamburg by the steamer "European," exploded on the 8th of April, 1866, at Aspinwall, destroying the steamer and other property. This was eight days before the explosion at the defendant's express office, and the news had not then reached San Francisco. Notwithstanding the efforts of Noble to bring his nitro-glycerine into notice in 1865, and the two shipments mentioned made by him early in 1866, at the time the case in question was shipped at New York and received at San Francisco, nitro-glycerine was not generally known to the public as an article of commerce. The explosions at Aspinwall and San Francisco, and subsequent ones occurring at Sidney and in England, attracted the attention of scientific men to the subject, and led to more careful investigation and experiment and to general knowledge of its properties.

The court found that neither the defendants, nor any of

the employés of the defendants, or of the Pacific Mail Steamship Company, who had anything to do with the package in question, nor the managing agent of the defendants on the Pacific coast, nor any of those killed by the explosion, knew the contents of the case in question, or had any means of such knowledge, or had any reason to suspect its dangerous character, and that they did not know anything about nitro-glycerine or glonoin oil, or that it was dangerous; that the case had the appearance of other cases usually received in the ordinary course of the defendants' business, and was received and handled by their employés in the same way that other cases of similar appearance were usually received and handled, and in the mode that men of prudence engaged in the same business would have handled cases having a similar appearance in the ordinary course of business, when ignorant of their contents, and with similar means of knowledge as that possessed by the defendants and their employés in this instance; and that there was no negligence on the part of the defendants in receiving the case, or in their failure to ascertain the dangerous character of the contents; and in view of the condition of their knowledge, of the want of means of knowledge, and the absence of any reasonable ground of suspicion, there was no negligence in the handling of the case at the time of the explosion.

The defendants either repaired or paid for the repairs (to the amount of about $6000) of the premises occupied by themselves, except a portion of certain repairs made by the plaintiff, which were necessarily made in connection with repairs made to those portions of the premises occupied by the other tenants of the plaintiff, and which the defendants omitted to pay for by mistake.

For the amount thus omitted to be paid, and interest, the court gave judgment for the plaintiff, but held that the defendants were not liable for any damage caused by the explosion to other portions of the buildings of the plaintiff, leased to and occupied by other tenants.

To review this judgment the plaintiff sued out a writ of error from this court.

*Messrs. R. M. Corwine and B. R. Curtis (with whom was Mr. Quinton Corwine), for the plaintiff in error:*

The question is, are Wells, Fargo & Co. liable for injuries to those parts of the building not rented by them? We assert that they are.

I. They are liable under the covenants of the lease. They were tenants holding over, under the covenants of a written lease, and were bound to keep all those covenants as much as if the original lease were still running.

One of those covenants was that they would " not receive in the demised premises, either for their own account or on storage, or allow any person to place therein, gunpowder, alcohol, or any other articles dangerous from their combustibility."

So, too, there is the other covenant: " at the expiration of the said term to quit and surrender the said demised premises, with all fixtures thereon contained, in as good a condition as the reasonable use and wear thereof will permit, damages by the elements excepted." How is a room, or how are certain apartments in, part of, and inseparable from an immense and splendid structure rendered in as good a condition as they were, when the whole immense and splendid structure having been blown to pieces, the room is rebuilt, a separate thing, with all the rest of the edifice piled up in ruins around it? Where the demised premises are so connected with— so part of a whole edifice—that they can never be restored in as good a condition as they were, unless the whole be so restored, a covenant to restore the demised premises in as good a condition as they were taken, is a covenant to restore the whole; certainly so where the whole has been destroyed by the plaintiff's act.

II. But, waiving this ground of covenant, we assert that the defendants were still liable for all the injuries to the premises, which they have produced. They were bound to know the nature of the property which they were introducing into the demised premises. Every person who undertakes a business in which the public is concerned is bound to conduct it with care, and if for want of that care injury

occur, to repair the injury. Can any one doubt that if this explosion had occurred on the vessel in which the box had been, that Wells & Fargo would have been liable for all injury done? They had accepted this unknown thing from a stranger, and they themselves shipped it; for they were, in truth, the shippers. So here they put it into the demised premises; no way differing in this respect from the ship, for they were their own consignees. Public carriers, shipping thousands of boxes upon steamers where many people are constantly at sea, without the least means either of preventing accidents which the dangerous contents of the boxes may produce, or of alleviating the injuries produced by such accidents, and where nothing but a knowledge on their part of what they do can protect travellers from catastrophes by explosion, ignition, and poison, are bound to know what they do. They put what they please on the ship. No one supervises them; and they remain on land. No promise to the public—no contract with any one—could place upon them a higher moral obligation to inform themselves than that which their business imposes upon them; for they are daily shipping articles, which may include articles like this, of a frightful power, easily brought into action, and where, if their power is brought into action at all, the consequences are awful indeed. Certainly men exercising such an employment, as do these sort of shippers, are bound to observe and exercise the usual and necessary precautionary and prudential steps which govern the conduct of every one. Where the rights of others are so vitally concerned mere ignorance of the *effect* of their acts will not excuse them. What is known to others, even although not of universal notoriety, they should be presumed to be conversant with. If they *might* know the character of property intrusted to them and neglect to inform themselves, they must suffer the consequences of neglect. In the reckless disregard of human life common by land and water in our country, and where so many lives and so much valuable property are involved and liable to destruction by the introduction, on vessels and into storehouses, of dangerous compounds, public

policy demands the establishment and enforcement of these rules.

If, however, the defendants are not to be held to the most rigid rules of accountability for this frightful catastrophe, still their liability is absolute, because they were sufficiently put upon inquiry.

1st. The box was delivered at the dock of defendants, in New York, at an unseasonable hour and day, and this fact was remarked upon by the agent of defendants, who likewise called attention to the unsafe condition or fastenings of the box. Assuming that the person who delivered it was ignorant of the company's rules or regulations, the courts will presume that defendants' agent was versed and practiced in them, and that he was conscious of their violation when he received and receipted for this box. There was no explanation offered as to why the box was brought there at that improper time, nor was any question asked.

2d. The name of the party who delivered the box was not given, and, so far as the bill of exceptions or the finding of the court discloses, it was not asked for.

3d. Neither was the box strapped, marked, or weighed. But, even if the man who received it was inexperienced and so ignorant that he did not understand the rules, the box remained with the company two days before the person who delivered it called for his regular receipt. Thus there was ample time for the facts to be reported to the officers by the party who acted for the company in the receipt of it, in order that he might be instructed as to his course when the person who delivered it called again. But the shipping clerk, in the face of these suspicious circumstances, gave the company's regular receipt for the box to the party when he called, some days after leaving it. Had these facts been reported to the officers, it is not at all impossible that the nature of the contents of this box would have been carefully inquired into. Each of these omissions was a violation of the *rules* of the company. Certainly they were, taken together, suspicious, because unusual circumstances, which should have put the defendants upon inquiry. That they

did not inquire is only a fact which shows neglect on their part.

*Mr. S. M. Wilson (who argued the case thoroughly on the precedents, English and American), contra.*

Mr. Justice FIELD, after stating the facts of the case, delivered the opinion of the court, as follows:

It appears from the record that the court finds, that neither the defendants, nor any of their employés, nor any of the employés of the Pacific Mail Steamship Company, who had anything to do with the case of nitro-glycerine, knew the contents of the case, or had any means of such knowledge, or had any reason to suspect its dangerous character, and that they did not know anything about nitro-glycerine, or that it was dangerous. And it also appears that the court finds, that there was no negligence on the part of the defendants in receiving the case, or in their failure to ascertain the dangerous character of the contents; and in view of the condition of their knowledge, of the want of means of knowledge, and the absence of any reasonable ground of suspicion, that there was no negligence in the handling of the case at the time of the explosion.

The question presented to us is, whether upon this state of facts the plaintiff is entitled to recover for the injuries caused by the explosion to his buildings, outside of that portion occupied by the defendants under their lease. For the injuries to that portion the defendants admit their liability, as for waste committed, under the statute. Immediately after the accident they repaired that portion with the sanction of the plaintiff, and placed the premises in a condition as good as they were previously. It appears, however, that a part of the expenses incurred were by mistake paid by the plaintiff in settling for repairs on other buildings. For the part thus paid the court gave judgment for the plaintiff under the first count, and the defendants take no exception to its action in this respect.

To fasten a further liability on the defendants, and hold

them for injuries to that portion of the buildings not covered by their lease, it was contended in the court below, and it is urged here, that, as matter of law, they were chargeable with notice of the character and properties of the merchandise in their possession, and of the proper mode of handling and dealing with it, and were consequently guilty of negligence in receiving, introducing, and handling the box containing the nitro-glycerine.

If express carriers are thus chargeable with notice of the contents of packages carried by them, they must have the right to refuse to receive packages offered for carriage without knowledge of their contents. It would, in that case, be unreasonable to require them to accept, as conclusive in every instance, the information given by the owner. They must be at liberty, whenever in doubt, to require, for their satisfaction, an inspection even of the contents as a condition of carrying the packages. This doctrine would be attended in practice with great inconvenience, and would seldom lead to any good. Fortunately the law is not so unreasonable. It does not exact any such knowledge on the part of the carrier, nor permit him, in cases free from suspicion, to require information as to the contents of the packages offered as a condition of carrying them. This was ruled directly by the Common Pleas in England in the case of *Crouch* v. *The London and Northwestern Railway.** The proposition that a carrier is, in all cases, entitled to know the nature of the goods contained in the packages offered to him for carriage, is there stated to be unsupported by any authority, and one that would not stand the test of reasoning.

In *Brass* v. *Braitland*,† it was held by the Queen's Bench that it was the duty of the shipper, when he offered goods which were of a dangerous nature to be carried, to give notice of their character to the owner of the ship, the Chief Justice, in delivering the opinion of the court, observing that "it would be strange to suppose that the master or mate, having no reason to suspect that goods offered to him

---

* 14 Common Bench, 291.    † 6 Ellis & Blackburn, 485.

for a general shipment may not be safely stowed away in the hold, must ask every shipper the contents of every package."

The case cited from the Common Pleas recognizes the right of the carrier to refuse to receive packages offered without being made acquainted with their contents, when there is good ground for believing that they contain anything of a dangerous character. It is only when such ground exists, arising from the appearance of the package or other circumstances tending to excite his suspicions, that the carrier is authorized, in the absence of any special legislation on the subject, to require a knowledge of the contents of the packages offered as a condition of receiving them for carriage.

It not, then, being his duty to know the contents of any package offered to him for carriage, when there are no attendant circumstances awakening his suspicions as to their character, there can be no presumption of law that he had such knowledge in any particular case of that kind, and he cannot accordingly be charged as matter of law with notice of the properties and character of packages thus received. The first proposition of the plaintiff, therefore, falls, and the second, which depends upon the first, goes with it.

The defendants, being innocently ignorant of the contents of the case, received in the regular course of their business, were not guilty of negligence in introducing it into their place of business and handling it in the same manner as other packages of similar outward appearance were usually handled. "Negligence" has been defined to be "the omission to do something which a reasonable man, guided by those considerations which ordinarily regulate the conduct of human affairs, would do, or doing something which a prudent and reasonable man would not do."* It must be determined in all cases by reference to the situation and knowledge of the parties and all the attendant circumstances. What would be extreme care under one condition

---

* Blyth v. Birmington Water Works, 11 Exchequer, 784.

of knowledge, and one state of circumstances, would be gross negligence with different knowledge and in changed circumstances. The law is reasonable in its judgments in this respect. It does not charge culpable negligence upon any one who takes the usual precautions against accident, which careful and prudent men are accustomed to take under similar circumstances.*

The case of *Pierce* v. *Winsor*,† decided by Mr. Justice Clifford, in the Circuit Court of the District of Massachusetts, furnishes a pertinent illustration of this doctrine. There a general ship was put up for freight. Among other freight offered and taken was mastic, an article new in commerce, and which was so affected by the voyage that it injured other parts of the cargo in contact with it, and caused increased expenditure in discharging the vessel. The court held the shipper and not the charterer liable, and observed that " the storage of the mastic was made in the usual way, and it is not disputed it would have been proper, if the article had been what it was supposed to be, when it was received and laden on board. Want of greater care in that behalf is not a fault, because the master had no means of knowledge that the article required any extra care or attention beyond what is usual in respect to other goods."

This action is not brought upon the covenants of the lease; it is in trespass for injuries to the buildings of the plaintiff, and the gist of the action is the negligence of the defendants: unless that be established, they are not liable. The mere fact that injury has been caused is not sufficient to hold them. No one is responsible for injuries resulting from unavoidable accident, whilst engaged in a lawful business. A party charging negligence as a ground of action must prove it. He must show that the defendant, by his act or by his omission, has violated some duty incumbent upon him, which has caused the injury complained of.

The cases between passengers and carriers for injuries stand upon a different footing. The contract of the carrier

---

* Sherman and Redfield, § 6.        † 2 Clifford, 18.

being to carry safely, the proof of the injury usually establishes a *primâ facie* case, which the carrier must overcome. His contract is shown, *primâ facie* at least, to have been violated by the injury. Outside of these cases, in which a positive obligation is cast upon the carrier to perform safely a special service, the presumption is that the party has exercised such care as men of ordinary prudence and caution would exercise under similar circumstances, and if he has not, the plaintiff must prove it.

Here no such proof was made, and the case stands as one of unavoidable accident, for the consequences of which the defendants are not responsible. The consequences of all such accidents must be borne by the sufferer as his misfortune.

This principle is recognized and affirmed in a great variety of cases—in cases where fire originating in one man's building has extended to and destroyed the property of others; in cases where injuries have been caused by fire ignited by sparks from steamboats or locomotives, or caused by horses running away, or by blasting rocks, and in numerous other cases which will readily occur to every one. The rule deducible from them is, that the measure of care against accident, which one must take to avoid responsibility, is that which a person of ordinary prudence and caution would use if his own interests were to be affected, and the whole risk were his own.*

And the principle is not changed whether the injury complained of follows directly or remotely from the act or conduct of the party. The direct or remote consequences of the act or conduct may determine the form of the action, whether it shall be case or trespass, where the forms of the common law are in use, but cannot alter the principle upon which liability is enforced or avoided. In *Brown* v. *Kendall*,† which was before the Supreme Court of Massachusetts, the action was in trespass for an assault and battery. The de-

---

* Hoffman *v.* Tuolumne County Water Co., 10 California, 413; Wolf *v.* St. Louis Indep. Water Co., Ib. 541; Todd *v.* Cochell, 17 Id. 97.

† 6 Cushing, 295.

fendant was trying to part two dogs, fighting, and in raising his stick for that purpose accidentally struck the plaintiff in his eye, injuring it severely. The court, Mr. Chief Justice Shaw delivering the opinion, held that the defendant was doing a lawful and proper act, which he might do by the use of proper and safe means; and that if in so doing, and while using due care and taking all proper precautions necessary to the exigency of the case to avoid hurt to others, the injury to the plaintiff occurred, the defendant was not liable therefor, and that the burden of proof was on the plaintiff to establish a want of due care on the part of the defendant. In *Harvey* v. *Dunlap,*[*] which was before the Supreme Court of New York, the action was trespass for throwing a stone at the plaintiff's daughter, by which her eye was put out. It did not appear that the injury was inflicted by design or carelessness, but on the contrary that it was accidental, and it was held that the plaintiff could not recover. "No case or principle can be found," said Mr. Justice Nelson, in denying a new trial, "or, if found, can be maintained, subjecting an individual to liability for an act done without fault on his part;" and in this conclusion we all agree.

JUDGMENT AFFIRMED.