**UNITED STATES of America**

**v.**

**John CAPRA et al., Defendants.**

**No. 73 Cr. 460.**

United States District Court,
S. D. New York.

Dec. 27, 1973.

---

See also, D.C., 372 F.Supp. 600–609.

Barry I. Slotnick, New York City, for John Capra.

Dennis D. S. McAlevy, Jersey City, N. J., for Leoluca Guarino.

Lawrence K. Feitell, New York City, for Stephen Della Cava.

Leonard J. Levenson, New York City, for Robert Jermain.

David Blackstone, New York City, for George Harris.

Joseph I. Stone, New York City, for Alan Morris.

Paul J. Curran, U. S. Atty., S.D.N. Y., Gerald A. Feffer, Lawrence S. Feld, Asst. U. S. Attys., for the government.

FRANKEL, District Judge.

The actual trial of this case (including approximately a half day for jury selection and one and a half days for the jury's deliberations) required a total of approximately 19 court days. As is not uncommon, a substantial number of other days prior to trial were required for the hearing of motions to suppress evidence. In the end, the three motions requiring those 11 further days of hearing were all denied. One such denial has been embodied in an opinion which was given to counsel but not filed until after the verdict, all being agreed that there should be all possible efforts to avoid publicity for this case. The concern about publicity, coupled with the pressures of time, led to the postponement of opinions explaining the rulings on the other two motions. This is the last of such delayed opinions, accounting for denial of a motion to suppress a large shipment of heroin and cocaine found in a suitcase.

On October 28, 1971, the suitcase in question was opened in a baggage room of the Central Union Railroad Terminal

in Toledo, Ohio. The suitcase was found to contain some 5½ kilograms of heroin and a kilogram of cocaine. The evidence thus disclosed came to be a substantial factor in a state narcotics trial in Toledo, where people there ultimately convicted sought unsuccessfully to suppress, claiming the requisite proprietary interest as grounds for their standing. Much later, as the instant case approached trial, three of the defendants herein brought on a similar motion, also claiming the necessary possessory interest.

As the motion in this case was originally presented, upon affidavits, the claim of a possessory interest by the movants—John Capra, Leoluca Guarino, and Stephen Della Cava—was in general and conclusory terms.[1] A question arose as to whether such broad conclusions, particularly in the odd circumstances of this case, should be deemed sufficient to afford standing. The court concluded that the concrete facts claimed to demonstrate such an interest should be the subject of evidentiary exploration and should be exposed to cross-examination, this course appearing to be comfortably open under the doctrine of Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), which bars the use of such testimony in the government's case in chief at trial. The upshot of this conclusion was a somewhat startling performance, serving in a vivid way to test the possible limits of our exclusionary doctrines. The movants proceeded to describe in particular detail

their engagement in a major narcotics transaction, recounting specifically their packaging of the huge quantity of heroin and cocaine exposed in the Toledo search. The three explained that they were partners in a variety of enterprises, including this particular narcotics transaction. Stephen Della Cava swore that, as the partner assigned to this role, he went to a local department store and purchased the suitcase. Then, he told us, the shipment of narcotics was packed in the suitcase, which was locked. The suitcase was given to another co-conspirator for delivery in Toledo.[2] As later developed at trial, the understanding in Toledo was that the courier would obtain a baggage check and mail it to the customer. The customer would thereafter pick up the suitcase, thus taking his narcotics delivery. Other evidence later showed that the transaction was completed, except that the consignees were arrested in Toledo when they arrived to claim the "property."

Messrs. Capra and Guarino testified as to their partnership interests. The totality of the testimony of the three was to the effect that they all jointly owned the suitcase,[3] and thus had joint and several standing to seek suppression of its contents found in the Toledo search.

The testimony from this point proceeded to take on an ersatz flavor of the Uniform Commercial Code rather than our usual narcotics case.[4] The movants

---

1. An affidavit of September 5, 1973, submitted by Della Cava and adopted by the other two defendants merely stated: "The bag * * * was owned by me together with the defendants CAPRA and GUARINO at the time of the aforementioned Toledo search and seizure."

2. Della Cava testified:
"Well, I don't remember dates exactly. What I do know is that I purchased the bag that supposedly was met in Toledo. I purchased it in Korvettes and I paid 30-something dollars for it. I also put this narcotics in this bag, took this bag and delivered it to Ramos."
In response to the question whether Della Cava had discussed with Capra and Guarino

the contents of the bag prior to loading it, he stated: "Yes, sir, we talked about the purchase of it, what went in it, what was going to go into it and who was going to get it."

3. The money used to purchase the bag was from what Della Cava termed a "kitty," contributed to by the three movants. Guarino elaborated on this in his testimony:
"If we had to make any expenditures in conjunction with any of our businesses, he would relate it back to us and we would reimburse him. That's the extent of the kitty we had."

4. Illustration from Della Cava's testimony:
"Q Now, did you have any discussion with Mr. Ramos regarding what would happen,

were taken through testimony by which they undertook to show that they never relinquished their possessory interest in the suitcase when it was given to the courier, the argument being that the risk of loss remained upon them.[5] As a further elaboration of this argument, they swore that they had not been paid in full for the narcotics, so that the ownership, as well as the risk of loss, never vested in the consignee.

■ The argument and the motion failed at this point. The evidence, suffi-

ciently at the suppression hearing, and then beyond a reasonable doubt at the trial, showed that these movants, in the particular transaction and in many others, consistently demanded that the payment for their narcotics shipments be "up front"—i. e., in advance of shipment and delivery.[6] From the evidence before this court, it appears that standing to attack the search, if it existed anywhere, resided in the consignees rather than the consignors. The movants here had been paid in full for their contraband and

---

if anything, should the drugs be lost in transit, whose risk or on which party the risk of loss would fall?

"A Are you asking me who would be responsible?

"Q Who would be responsible.

"A I would be responsible."

See also these compliant responses by defendant Guarino:

"Q I want to ask you—Strike that.

"With respect to what you felt in your mind back in October of 1971, who was responsible for those drugs until the entire amount of money, as agreed upon, was paid?

"A The four partners.

"Q And if anything happened to those drugs, I don't care whether they were seized or whether they were destroyed, who would stand the loss with respect to that?

"A The four partners.

"Q That was your agreement?

"A Yes.

"Q And that was your state of mind?

"A Correct.

"Q Were you at any time, either you or your partners, paid in full as per the agreement you all had together?

"A No.

"Q Is it your testimony that you did not know to whom Mr. Ramos had agreed to ultimately dispose of the drugs with [*sic*]?

"A Correct.

"Q That was his business?

"A I never inquired.

"Q Your part of the partnership was to produce the drugs, give them to Ramos for the ultimate final sale?

"A Correct.

"Q And that sale was never materialized, was it?

"A Correct.

"Q There was still a balance due and owing the last time you saw those drugs?

"A Correct.

Similarly, defendant Capra testified:

"Q Was there a sale consummated prior to their receipt by the buyer?

"A All they wanted was a partial payment down.

"Q Would you tell me the arrangements?

"A All right. I'll tell you the whole arrangements. The arrangements was we would not give anything up unless we got any money first, partial anyway.

"Q That's known as front money; is that correct?

"A That's correct. When we got the money, then we proceeded to give the money, take the narcotics with the assumption that if it is not what it's supposed to be or short or bad, or whatever, the money would come back to those people that put up the money for the narcotics. And we would get the narcotics back and we would turn it back.

"Q What was your understanding if the narcotics were seized prior to the people receiving it in Toledo, Ohio?

"A That's my responsibility because somebody, they can't pay for what they don't get.

"Q Therefore, in your own mind and in actuality, you never relinquished possession of the narcotics and the suitcase; is that correct?

"A Never."

5. Della Cava testified that he and his partners "would get the money or the suitcase back" depending on whether or not the customers were satisfied with the shipment. Capra stated that "definitely" the partners would have to pay for the narcotics if they were seized. And, if the narcotics were short "it would be up to the people that were getting the delivery to do what they wanted with it, as far as maybe balancing it out with money or return it or just ask for the rest of the delivery."

6. Although the three movants testified at the hearing that they had only received a down payment for the narcotics shipment, their own figures belied this assertion. Any amounts still owing were for their codefendant Jermain and Joaquin Ramos, a co-conspirator who testified for the prosecution.

had *no further* interest of any kind either in the wrapping—the suitcase—or the contents. See United States v. Epstein, 240 F.Supp. 80, 82 (S.D.N.Y. 1965).

This conclusion seems sufficient in itself to defeat the motion.[7]

▮ It should be noted, however, that on the further facts disclosed by our hearing, the motion to suppress would be denied in any event. The court concludes that upon the particular facts of this case, as they unfolded in Toledo, there was no such invasion of privacy through the opening of the suitcase as to require suppression of the fearsome things the suitcase contained.

The suitcase was checked at the baggage room of the Railroad Terminal at approximately 11:15 a. m. on October 20, 1971. The baggage agent on duty, Milton Julert, suggested to the depositor that the case be placed in a coin locker on the main concourse of the terminal where it would be safer. The man insisted, however, that it be kept in the baggage room. He stated that he would pick it up in a day or two.

Julert thought the circumstances suspicious. The baggage room was ordinarily used as a repository for periods of up to a few hours for luggage to be placed on or received from the two trains which daily passed through Toledo. The suitcase was the first item parcel-checked in six months. In addition, the man who left the suitcase "acted funny," was "nervous and tense," and raised his voice aggressively in rejecting the agent's suggestion. Furthermore, when removing the bag to the storage area, Julert noted it was unusually heavy and made a "rustling" sound like cellophane or plastic. For a fleeting moment, he considered that the bag might contain a bomb. Since Julert was scheduled to be off for the next two days, he reported the presence of the suitcase to the relief baggage assistant, Charles Sibold. On Saturday, October 23, Sibold made a similar examination of the suitcase, noting its weight and the "swishing" sound it produced.

When the bag had not been claimed by Tuesday, October 26, Sibold and Julert discussed its continued presence and Sibold suggested that the Railroad police be contacted. Julert was concerned about the security of the suitcase. Sibold on the other hand was worried that it might contain explosives.

Sibold spoke the next day with Captain Albert Blevins of the Penn Central Police. Sibold related the circumstances surrounding the checking of the bag and indicated that he wished to open it. Both men then went to the baggage room where Sibold attempted unsuccessfully to open the suitcase with keys kept on hand. Blevins testified that his function was to act as a witness, pursuant to Penn Central policy, to protect the baggage agent and the company from future claims. By this time, Blevins was similarly concerned about the contents of the suitcase. He had been present on a prior occasion when the makings of a pipe bomb were discovered in a parcel stored in the Penn Central Station in Cleveland. Blevins told Sibold that he would try to get help in opening the bag, and that afternoon he requested such assistance from his friend and "primary contact" with the

---

7. This result does not create any problem of inconsistency in the Government's positions of the kind considered in Jones v. United States, 362 U.S. 257, 263, 80 S.Ct. 725, 4 L. Ed.2d 697 (1960), quite apart from the somewhat open question as to how far such inconsistencies may matter under the law as it exists today. Brown v. United States, 411 U.S. 223, 228–229, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973).

The motion to suppress was made, quite properly, in terms of Counts 4 and 5 of the indictment, which related to the transaction ending in the Toledo seizure. It was entirely consistent with the Government's position before trial, still more clearly at the trial, to show that the movants had possessed the narcotics, as the indictment alleged, "in the Southern District of New York," and that this possession ended when the suitcase was given in this District to a courier, well before the later search and seizure in Toledo.

Toledo Police Department, Detective George Ryan. Blevins indicated to Ryan his suspicion regarding the possible presence of explosives.

The following day, Thursday, October 28, 1971, Detective Ryan arrived at the terminal accompanied by Officer Gerry Bedal and Detective Robert Beavers. Bedal, who had experience in opening locks, had been en route to the station with Ryan when they met Beavers and invited him to join them. Both Ryan and Beavers were assigned to the Metropolitan Drug Unit of the Toledo Police Department. At the baggage room, Bedal, in the presence of Sibold, Blevins, and the two other officers, attempted unsuccessfully to turn the two locks on the suitcase with a screwdriver and a pick-like instrument. He finally opened the locks with paper clips provided by Blevins and Sibold. Sibold then took and opened the suitcase. Inside there were a number of plastic bags containing a white powder and some towels. Officer Beavers picked up one bag with the initial "C" on it, opened and examined it, and showed it to Detective Ryan. Suspecting that the bags might contain narcotics, the officers requested a field test kit from the Metropolitan Drug Unit.

When the field test of the "C" bag produced a positive result, several officers took two of the bags to a nearby laboratory for further examination. The suitcase and contents were stored overnight in a safe at the Terminal. The next day officers removed the plastic bags to the police station, replacing them with objects of equivalent weight.

On October 31, 1971, at approximately 8:15 a. m. Willie Middlebrook, named as a co-conspirator but not a defendant, presented the claim check and obtained the suitcase. In the main concourse of the terminal, he met defendant Alan Morris. Both were arrested by the Toledo police.

Upon the foregoing facts, the court would sustain the seizure if there were occasion to reach the question. This was not an "intrusion" initiated by law enforcement officers "with the specific intent of discovering evidence of a crime * * *." Cady v. Dombrowski, 413 U. S. 433, 442 n., 93 S.Ct. 2523, 2529, 37 L. Ed.2d 706 (1973). See also Haerr v. United States, 240 F.2d 533, 535 (5th Cir. 1957). It was in fact a "private" search in the ample sense that it was undertaken by private persons acting upon private suspicions touching legitimate concerns of their own and their employer. But for their inability to open the suitcase by themselves without damaging it, the railroad employees would never have involved the police. Failing in their own efforts, the baggage room employee and security officer were still concerned over the suspicious circumstances attending the stored bag —the somewhat menacing manner of the man who had left it, the long delay after the promise to return for it in a day or two, the unusual weight of the bag, and the disturbing sound of its contents.

While the railroad employees did not have or seek legal advice, their conduct was at least consonant with their employer's duties and rights—whether as a non-gratuitous bailee, see O'Brien v. Penn. R. Co., 184 F.Supp. 305, 307 (S. D.N.Y.1960); United States Fire Ins. Co. v. Paramount Fur Service, 168 Ohio St. 431, 156 N.E.2d 121 (1959); National Liberty Ins. Co. v. Sturtevant-Jones Co., 116 Ohio St. 299, 156 N.E. 446 (1927); F. E. Avery Co. v. George, 160 N.E.2d 305 (Ohio App.1959); cf. Boyden v. United States, 80 U.S. (13 Wall.) 17, 21–22, 20 L.Ed. 527 (1877), or as a common carrier, see 47 U.S.C. § 20(11); Missouri Pac. R. Co. v. Elmore & Stahl, 377 U.S. 134, 84 S.Ct. 1142, 12 L.Ed.2d 194, rehearing denied, 377 U.S. 984, 84 S.Ct. 1880, 12 L.Ed.2d 752 (1964); Secretary of Agriculture v. United States, 350 U.S. 162, 165 n. 9, 76 S.Ct. 244, 100 L.Ed. 173 (1956); Continental Can Co. v. Eazor Express, Inc., 354 F.2d 222 (2d Cir. 1965); cf. The Nitro-glycerine Case, 82 U.S. (15 Wall.) 524, 21 L.Ed. 206 (1872); Bruskas v. Railway Express

Agency, 172 F.2d 915, 918 (10th Cir. 1949), to protect its own property, the property of passengers, and the physical safety of everyone against even modest, if not chimerical, dangers of explosions or other kinds of destruction.

When the Toledo police officers arrived in this setting, the occasion for their presence was primarily service to those who had enlisted their aid rather than the pursuit or detection of criminals. Undoubtedly, they were prepared to be interested in evidence of criminal misconduct. But they were not required to have a search warrant for the precautionary assistance they came to supply. See Cady v. Dombrowski, 413 U.S. 433, 442 n., 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); Haerr v. United States, 240 F.2d 533, 535 (5th Cir. 1957); Marshall v. United States, 422 F.2d 185, 189 (5th Cir. 1970).

In short, the court would sustain this as an essentially private search and a lawful seizure under authorities not always perfectly harmonious but sufficient in their net effect to validate what was done here. United States v. Blum, 329 F.2d 49, 52 (2d Cir.), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1045 (1964); Wolf Low v. United States, 391 F.2d 61 (9th Cir.), cert. denied, 393 U.S. 849, 89 S.Ct. 136, 21 L.Ed.2d 119 (1968); United States v. Averell, 296 F.Supp. 1004, 1008–1012 (E.D.N.Y. 1969); see United States v. Beasley, 485 F.2d 60 (10th Cir. 1973); United States v. Echols, 477 F.2d 37 (8th Cir. 1973), cert. denied, 414 U.S. 825, 94 S.Ct. 128, 38 L.Ed.2d 58 (1973); United States v. Burton, 475 F.2d 469 (8th Cir. 1973); United States v. Cangiano, 464 F.2d 320 (2d Cir. 1972), vacated on other grounds, 413 U.S. 913, 93 S.Ct. 3047, 37 L.Ed.2d 1023 (1973); United States v. Tripp, 468 F.2d 569 (9th Cir. 1972), cert. denied, 410 U.S. 910, 93 S.Ct. 965, 35 L.Ed.2d 272 (1973); Gold v. United States, 378 F.2d 588, 591 (9th Cir. 1967); United States v. Pryba, 312 F.Supp. 466, 472 (D.D.C.1970). But cf. Corngold v. United States, 367 F.2d 1 (9th Cir. 1966).