COMMONWEALTH *vs.* PORTER P., a juvenile.

No. 07-P-654.

Suffolk. May 8, 2008. - October 31, 2008.

Present: KATZMANN, MEADE, & SIKORA, JJ.

Further appellate review granted, 453 Mass. 1101 (2009).

*Search and Seizure,* Expectation of privacy, Consent. *Constitutional Law,* Search and seizure.

A Juvenile Court judge erred in allowing the juvenile's motion to suppress a firearm and ammunition that police seized during a warrantless search of a bedroom in a shelter where the juvenile and his mother resided, as the juvenile had no constitutionally protected reasonable expectation of privacy in the room, which he knew was subject to being searched by shelter staff who were charged with maintaining order and safety [91-94]; further, even assuming the juvenile had an objectively reasonable expectation of privacy in the room, the police search was permissible because it was conducted with the free and voluntary consent of the shelter's director, who possessed the ability and apparent authority to give consent, and who had been informed by one of the shelter security officers that the juvenile had directly told that individual that he had a gun [94-96].

A Juvenile Court judge erred in suppressing the juvenile's voluntary statement upon police seizure of a gun from his room at a shelter, where the statement was not the product of custodial interrogation, but rather was made spontaneously and not in response to any specific questioning. [96]

COMPLAINT received and sworn to in the Suffolk County Division of the Juvenile Court Department on October 27, 2006.

A pretrial motion to suppress evidence was heard by *Leslie E. Harris,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Francis X. Spina,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.

*Kathleen Celio,* Assistant District Attorney, for the Commonwealth.

*James D. Corbo* for the juvenile.

KATZMANN, J. The defendant (a juvenile) and his mother lived in a bedroom, to which they had keys, in the Roxbury Multi-Service Center Family House Shelter (shelter). Their occupancy of that room was conditioned upon their acceptance of various shelter policies, rules, and regulations, set forth in the resident's manual (manual), which is designed to promote safety in the shelter and includes a prohibition on the possession of weapons. Toward that end, as residents, they were subject to limitations on their privacy, including access by the director to their rooms, and random and routine searches of their rooms. On October 26, 2006, the director of the shelter, who possessed a master key, accompanied by officers of the Boston police department, entered the locked bedroom assigned to the defendant and his mother, to secure a firearm alleged to be in the room. Upon entry, the officers removed the defendant from the room and proceeded to conduct a warrantless search, ultimately discovering a firearm and ammunition in the room's closet amongst the defendant's belongings. While being arrested, the defendant made certain statements relating to the firearm. The defendant moved to suppress the evidence and the statements.

A Juvenile Court judge allowed the motion to suppress the firearm and ammunition, determining that the defendant and his mother had a reasonable expectation of privacy in the room, that the warrantless search was unreasonable, and that the shelter director did not have authority (or apparent authority) to enter the room to search for a firearm. The judge also allowed the motion to suppress the statements on an independent ground, reasoning that they were the product of custodial interrogation. A single justice of the Supreme Judicial Court allowed interlocutory review. We reverse the allowance of the motion to suppress.

*Background.* After a hearing at which Cynthia Brown, the director of the shelter, and Detective Frank McLaughlin of the Boston police department testified, the judge made the following unchallenged written findings of fact, that we supplement with uncontroverted facts adduced at the hearing to fill out the narrative and that were explicitly or implicitly credited by the judge. See *Commonwealth* v. *Butler,* 423 Mass. 517, 518 n.1, 526 n.10 (1996); *Commonwealth* v. *Isaiah,* 448 Mass. 334, 337-338 (2007); *Commonwealth* v. *Cataldo,* 69 Mass. App. Ct. 465, 472 (2007). We also include relevant sections of the manual.

The Roxbury Multi-Service Center, Inc. (center), is a nonprofit organization located in the Dorchester section of Boston. One of the center's programs is the shelter, a transitional family emergency entity that provides temporary housing for homeless families until the family, with the organization's assistance, is able to secure permanent housing. All resident families are referred to the shelter by the Department of Transitional Assistance (department). So long as there is a vacant room, the shelter is contractually obligated to accept families sent by the department. Families may remain at the shelter until their emergency assistance eligibility benefits, that the department pays directly to the shelter, "run out." According to its mission statement, the goal of the shelter, "in addition to providing temporary housing, is to promote dignity, self-reliance and a sense of community [among] residents at the shelter while increasing their capacity to become active and empowering agents in their own growth and future."

The shelter accommodates up to twenty-four families at any given time and anticipates stays of approximately four to eight months. It is comprised of two brownstones, renovated into a single three-floor facility. It is a "congregate shelter," meaning that "residents share all common areas except for their bedrooms." "[R]esidents are not allowed access or permitted to enter another resident's room at any time." Bedrooms are located on the first, second, and third floors. Common areas include the visitor's lounge, the dining room, two residents' lounges, and the children's play area and are located on various floors. Common bathrooms are located on each floor. The shelter staff offices are located on the first floor and in the basement.

Upon arriving at the shelter, the mother and the defendant, assisted by a shelter case manager, completed the "intake" process, which included reviewing the manual and acknowledging the obligation to comply with its requirements. The manual states:

"[T]he shelter strives to provide a safe and comfortable living environment. As such, . . . [four] shelter policies [including a 'Violence Policy,' that prohibits weapons of any kind and that provides for immediate termination of

any resident in possession of a weapon[1]] have been es-
tablished to protect the welfare of all the shelter residents
and staff with *zero tolerance* for individuals who violate
these policies. Depending on the severity of the violation,
the shelter reserves the right to contact the police without
hesitation should the situation warrant . . . ."[2]

Besides inclusion in the manual, these policies and regulations
were posted throughout the shelter, including the common areas
and on the wall adjacent to Brown's office. To promote safety
and other designated policies, the manual also provides for
entry by shelter staff to the rooms,[3] as well as "random room

---

[1]Under the heading, "[Shelter] Policies" and the subheading, "Violence
Policy," the manual provides:

"*Weapons*

"[The shelter] does not allow weapons of any kind (any item that can
be used to threaten or cause physical damage or harm) at [the center]
— [the shelter] or during any center sanctioned event. *Any resident in
possession of a weapon will be terminated immediately.* [The shelter]
reserves the right to contact the Police should the situation warrant."

[2]Under the subheading "Confidentiality" of the section "Standards of
Conduct," the manual further provides:

"[The shelter] staff have an obligation to notify the appropriate authori-
ties if you are witnessed or if you reveal information about being
involved in an illegal act while residing at [the shelter]."

[3]Under the subheading "Controlled Entry to Rooms" of the section on
"Orientation," the manual provides:

"[The shelter] reserves the right to enter any [shelter] residential room
for professional business purposes (maintenance, room inspections,
etc.). All business professionals requiring entry will be accompanied by
[the shelter] Staff at all times while in the room."

With respect to this provision, Brown testified:

"What that indicates is that if we need to access any one of the resident's
rooms, the staff has the right to do that. I classified it as 'controlled
entry' because nobody goes into a resident's room without my knowledge
as director. If we have to have different professional people to come in
— exterminators, maintenance people — whatever professional people
that we need to provide a service, if they have to access the resident's
room, then it is a controlled access, meaning that I am informed. I have
the key. I have given them permission. They are usually escorted up —
either maintenance people or the like the exterminator or something —

checks and routine room inspections of residents' rooms at any time . . . without warning . . . ."[4]

Upon completion of the intake process, the defendant and his mother were assigned to room 24. They were given a key to room 24 and informed that they could keep their personal belongings in that room.[5] Personal items are limited to those permitted in the manual and must be inventoried. At some point, the mother had paid the thirty-dollar deposit required for the room key.

On October 24, 2006, the shelter security officer informed Brown "that there was a possibility that a gun was being kept on the premises of the shelter." The security officer had learned of the weapon from a shelter resident. As this was the first time in Brown's tenure that a resident had a gun in the shelter, she sought further advice. At the suggestion of the shelter's executive director and officials at a nearby nonprofit organization involved in juvenile violence issues, Brown contacted Sergeant

they're escorted up to the room and then they have the access to the room."

[4]Under the heading of "Housekeeping Issues" and the subheading "Room Checks & Inspections," the manual provides:

"[The shelter] reserves the right to perform random room checks and routine room inspections of residents' rooms at any time. Room checks and inspections usually occur without warning as to allow [the shelter] staff to monitor the 'Good Housekeeping Standard,' health and safety issues, unapproved guest, unattended children, and a host of other [shelter] violations that may be of concern."

With regards to this provision, Brown testified:

"We have what is classified as a 'good housekeeping standard,' and we also have rules and regulations that bind us for health and safety. So, periodically the staff will go in, more the staff than I, will go in and do a room check. And they open up the door . . . they knock on the door, announce themselves, open up the door, go in, and they'll pretty much look at the room to see if it's tidy or clean. If there's a reason to believe that there's something going on in a room, then you know they'll look for something in particular. Make sure that the exits are clear. Make sure that, you know, the residents are not supposed to have food in their rooms. Those kinds of things. They're not supposed to smoke in their rooms. So when you do a room check, you're checking for all of the possible violations, in general."

[5]The manual states that the shelter provides each family with a "private room."

Detective Bailey of the Boston police department "so that he would be able to give me direction as to how we needed to proceed with this process."

On October 25, 2006, the shelter was abuzz with rumors that a resident had a gun. One shelter resident informed Brown that "he had heard . . . that the [defendant] had a gun." Later, the defendant informed Gina Jordan, a shelter security officer, that he had a gun. Jordan relayed this information to Brown that night. Brown once again contacted Sergeant Detective Bailey to update him on the matter. The police were expected the following morning.

At approximately 10:30 A.M. on October 26, 2006, Detective McLaughlin, accompanied by Sergeant Detective Sullivan and Officers Ross, Flaherty, and Keaveney, met with Brown at the shelter. In the ensuing conversation, Brown explained to the officers that, in her opinion, she could conduct room searches and that the manual provided the authority for these searches. Brown showed relevant portions of the manual, those relating to room checks, weapons, and violence, to the officers. The judge found that Detective McLaughlin believed Brown had the authority to consent to a search of room 24.[6] As an initial course of action, Brown and the officers agreed that they would confront the defendant and ask for the weapon.

Brown and the officers then proceeded upstairs to room 24. Brown knocked on the door and announced "room check." There was no answer. Almost contemporaneously, Brown proceeded to use her master key to open the locked door.

Upon opening the door, Brown and the officers observed the defendant standing by the bed, wearing nothing but his underwear. Brown informed the defendant that she "was there to do a room check" due to allegations that he had a gun in the room. Brown elaborated that the officers were with her to perform the

---

[6]Detective McLaughlin testified that "[Brown] told us that the policies allowed her the authority to go through and check rooms, that she had written the policy." The officers also independently conducted a review of the relevant portions of the manual. After this, Brown and the officers discussed several options, including seeking a search warrant. Brown and the officers also discussed how Brown had previously relied on the manual to conduct searches for drugs.

search for the gun. The defendant's mother was not present in the apartment.[7]

At this time, Detective McLaughlin asked the defendant to step out of the room and into the common hallway. The defendant complied with the detective's request, but when questioned about the gun, denied having one.

During this time, three of the officers, with Brown's implicit permission, entered the room and began to search for the weapon. The search produced a firearm "that was found under a duffle bag inside the closet." The firearm contained hollow point bullets.

After the gun was located, the defendant was placed under arrest. Following the arrest, the defendant "spontaneously" stated that the gun had "no bodies on it" and that it was "clean."

*Discussion.* 1. In a constitutional sense, a search has taken place when "police conduct has intruded on a constitutionally protected reasonable expectation of privacy." *Commonwealth* v. *Montanez*, 410 Mass. 290, 301 (1991). *Commonwealth* v. *Colon*, 449 Mass. 207, 213 (2007).[8] A defendant's expectation of privacy is a measure of "(1) whether the defendant has manifested a subjective expectation of privacy in the object of the search, and (2) whether society is willing to recognize that expectation as reasonable." *Montanez, supra.* See generally Smith, Criminal Practice and Procedure § 4.8 (3d ed. 2007). The defendant bears the burden of establishing both of these elements, *Montanez, supra,* and only then does the burden shift to the Commonwealth to prove that the search was reasonable and lawful. *Commonwealth*

---

[7] The manual provides that all the shelter residents are to be out of the building on weekdays between the hours of 9 A.M. and 3 P.M. If a resident is ill, he or she may stay in the building so long as the illness is reported to the shelter.

[8] For the purposes of our discussion, we assume, arguendo, that the search at issue was a police action implicating analysis under the familiar constitutional framework. The Commonwealth has not suggested otherwise. We thus do not consider whether the search was a private search, with the police assisting Brown in the implementation of her right under the manual to search a resident's room for weapons. See generally Smith, Criminal Practice and Procedure § 4.7 (3d ed. 2007); Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 3.3[d], at 3-13 (2008-2009 ed.). Cf. *United States* v. *Capra*, 372 F. Supp. 603, 607-609 (S.D.N.Y. 1973) (police involvement aiding private party did not transform action to one of constitutional dimension).

v. *Pina*, 406 Mass. 540, 544, cert. denied, 498 U.S. 882 (1990). Thus, the issue is whether the defendant had a subjective expectation of privacy in his family's locked, private room at the shelter, and whether society objectively recognizes this expectation as reasonable.

It is undisputed that the defendant and his mother had lived in room 24 for approximately eight months preceding the search. Assuming, arguendo, that the defendant had a subjective expectation of privacy in that room, cf. *Commonwealth* v. *Mallory*, 56 Mass. App. Ct. 153, 157 (2002); *Minnesota* v. *Olson*, 495 U.S. 91, 99 (1990), whether society recognizes that expectation as objectively reasonable depends upon "the nature of the occupancy and the circumstances attending it." *Mallory, supra.* "In evaluating the reasonableness of an individual's expectation of privacy, we look to a number of factors, including the character of the location involved. Thus, we consider whether the defendant owned the place involved, ['or controlled access to it,' *Pina, supra* at 595], and whether the area was freely accessible to others." *Commonwealth* v. *Welch*, 420 Mass. 646, 653-654 (1995) (citations omitted). Other factors may include whether the defendant had taken precautions to protect his privacy, and whether the defendant had a possessory interest in the item taken. *Pina, supra* at 546.

Here, the defendant and his mother lived in a room in a twenty-four room shelter. The department paid their rent. They could not choose their room, and could be transferred to another room if deemed necessary by the shelter. They voluntarily agreed to live in a highly regulated environment, where shelter staff were charged with maintaining order, discipline, and a safe environment.

The defendant had neither exclusive control nor sole access to room 24. Brown maintained a master key to the room and was permitted, along with her staff (acting under her direction), entry for certain purposes specified in the manual. No other individual, including any staff member, could enter a resident's room without Brown's permission. Indeed, Brown had more control over who could enter room 24 than the defendant and his mother, who were prohibited from allowing any other residents or visitors into that room. Thus, Brown had sufficient common

authority over room 24, or at least a "sufficient relationship to the premises" to consent to a search of the room. *United States* v. *Matlock*, 415 U.S. 164, 171 (1974). *Commonwealth* v. *Wahlstrom*, 375 Mass. 115, 118 (1978). See *Commonwealth* v. *Ploude*, 44 Mass. App. Ct. 137, 140 (1998) ("a person who has 'common authority' over the property to be searched may properly consent to a search"). See also *Welch, supra* at 654 (locker room area was under control of fire department and deputy chief could consent to search). The defendant and his mother, in entering the shelter, acknowledged this authority, thereby distinguishing the defendant's relationship with the shelter from that of the usual landlord-tenant or hotel manager and guest relationship.[9] See *Chapman* v. *United States*, 365 U.S. 610 (1961) (landlord cannot consent to search of tenant's residence); *Stoner* v. *California*, 376 U.S. 483, 489-490 (1964) (hotel manager cannot consent to search of hotel room, but may permit entry for cleaning and maintenance purposes).

Moreover, as noted previously, the defendant's occupancy was regulated by the shelter's strict policies and rules. See *Mallory*, 56 Mass. App. Ct. at 158 (defendant's limited expectation of privacy in room at house was dependent on relationship with host). In acknowledging during the intake process that they were obligated to comply with the manual, residents at the shelter accepted restrictions on their personal freedoms in exchange for a temporary place to live. In exchange for a private room at the shelter, residents acceded to life in a highly regulated environment and a diminished expectation of privacy with respect to the shelter staff access.

Furthermore, as we have also noted, the manual provides that shelter staff may conduct room inspections at any time without warning to monitor "safety issues" and a host of "violations that may be of concern" — that include violation of the shelter's prohibition on possession of weapons in a room. See *Commonwealth* v. *Considine*, 448 Mass. 295, 301 (2007) (by requiring students to surrender their keys each morning, private school officials maintained control of room and could thus authorize security guard's entrance); *People* v. *Alston*, 16 A.D.3d 358,

[9]The motion judge's analogy of the relationship between Brown and the defendant and his mother to that of landlord-tenant or hotel clerk and guest was thus in error.

358-359 (N.Y. 2005) (homeless defendant's contractual agreement to permit shelter staff access to his locker eliminated any expectation of privacy defendant may have had in locker); *People v. McClain*, 29 A.D.3d 824, 824-825 (N.Y. 2006) (shelter guidelines, acknowledged by defendant, permitted search of locker). Our analysis of the reasonableness of the defendant's expectation must thus also contemplate the humane mission of the shelter — to provide a safe and comfortable environment for homeless families. In furtherance of that mission, and to effectuate the goal of providing a place free of violence for those who seek refuge in that shelter, it is appropriate that shelter officials be able to take steps to ensure that a sanctuary is established. It is this context which also informs the determination of the objective reasonableness of an asserted expectation of privacy.

In sum, Brown and the shelter staff had information that the defendant had a weapon in the room that he occupied subject to the knowledge that rooms could be searched by shelter staff who were charged with maintaining order and safety. Under these circumstances, even if the defendant had a subjective expectation of privacy in the room, he did not have an expectation of privacy that society would deem objectively reasonable. There was, accordingly, no constitutionally protected reasonable expectation of privacy. "The police conduct, therefore, did not constitute a search in the constitutional sense." *Commonwealth* v. *Montanez*, 410 Mass. at 303.

2. Assuming, arguendo, that the defendant did have an objectively reasonable expectation of privacy in the room, the warrantless search by the police was permissible here because it was conducted with the free and voluntary consent of a person — Brown — possessing the ability and apparent authority to give the consent. *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 222 (1973). *Commonwealth* v. *Rogers*, 444 Mass. 234, 236 (2005). See generally Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 11-1 (2008-2009 ed.). Given that it is undisputed that Brown initiated contact with the police, requested that they come to the shelter, and led them to room 24, where she monitored the officers' search, the voluntariness of her consent is not an issue. The inquiry thus focuses on whether the

third party, Brown, reasonably appeared to have joint access to, or a right of control over, the area to be searched. See *Commonwealth* v. *Voisine*, 414 Mass. 772, 783 (1993); *Commonwealth* v. *Sanna*, 424 Mass. 92, 97-98 (1997). Even when police reasonably, though mistakenly, believe that a third party has the authority to consent, the search is lawful. *Illinois* v. *Rodriguez*, 497 U.S. 177, 186 (1990).

Here, as we have stated previously, all twenty-four rooms at the shelter were under the custody and control of Brown, the shelter's director. Even if Brown did not have actual authority to consent to the search, the police — based upon their independent review of the manual, Brown's status as the director of the shelter, and their discussions with her about prior searches — could reasonably have concluded, though the judge found otherwise, that Brown had the common authority to authorize entry into room 24. See *Commonwealth* v. *Maloney*, 399 Mass. 785, 787-788 (1987); *Commonwealth* v. *Allen*, 54 Mass. App. Ct. 719, 721 (2002) (so long as consent is freely given, officers may conduct search "when authorized to do so by any competent person who reasonably appears to exercise common authority over the place to be searched"). Furthermore, given that there was probable cause[10] to believe the defendant was in fact hiding a weapon in room 24, the officers could have concluded that Brown had a reasonable basis of fact upon which to rely in deciding to enter the room to secure the firearm.[11]

The defendant, relying on *Georgia* v. *Randolph*, 547 U.S. 103 (2006), counters that the police, upon encountering him in the doorway, should have also sought to obtain his consent. The simple answer is that *Randolph* does not apply because the defendant and Brown are not cotenants. The defendant's argument is based on an over-extension of *Randolph*, which only stands for the

---

[10]As has been noted, and as the judge found, "[O]ne of the shelter security officers, informed Brown that the defendant had directly told her that he had a gun."

[11]We note that in the school environment context, where administrators are charged with protecting the student body and swift and immediate action is needed to maintain order, a search of a student by an administrator is permitted if the search is reasonable under all of the circumstances. See *Commonwealth* v. *Damian D.*, 434 Mass. 725, 728 (2001); *Commonwealth* v. *Considine*, 448 Mass. 295, 298 (2007).

proposition that police may not enter when one cotenant of relatively equal status refuses to permit entry. The defendant and Brown were not on equal footing.

3. The defendant's voluntary statement to Officer Ross that "the gun had no bodies on it, it's clean" was not the product of custodial interrogation, and thus, does not implicate Miranda rights. Although the defendant may very well have been in custody at the time of the statements, the judge found that the defendant made the statements spontaneously and not in response to any specific questioning. The defendant concedes this point. Accordingly, we reverse the judge's suppression of the statements.

The allowance of the motion to suppress a firearm and ammunition and to suppress statements is reversed.

*So ordered.*